**John S. FREUND, Petitioner–Appellant,**

**v.**

**Robert A. BUTTERWORTH, Attorney General, Respondent–Appellee.**

No. 93–5317.

United States Court of Appeals, Eleventh Circuit.

July 16, 1997.

Atty. Gen., West Palm Beach, FL, for Respondent–Appellee.

Paul Morris, Stephen H. Rosen, Coral Gables, FL, for Petitioner–Appellant.

Robert W. Butterworth, Attorney General, State of Florida, Tallahassee, FL, Melvina Flaherty, Office of the Attorney General, West Palm Beach, FL, Myra J. Fried, Asst.

Before TJOFLAT and ANDERSON, Circuit Judges, and FAY, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This habeas corpus case provides a classic example of how a conflict of interest can prevent a law firm from adequately representing a criminal defendant. The resolution of this case lies at the intersection of legal ethics and the constitutional protections afforded criminal defendants. The petitioner and another man faced murder charges in a Florida state court for a gruesome, drug-related killing. The State sought the death penalty. In light of the information gathered during the police investigation following the murder, the State did not have a strong case against the petitioner: all physical evidence pointed to the co-defendant; the only testimony directly identifying the petitioner as the murderer was that of a witness with serious credibility problems; and significant evidence suggested that the petitioner lacked the requisite intent to commit murder.

The law firm making the petitioner's defense had one problem: it had a long-standing, professional and social relationship with the opposing defendant. It had represented the opposing defendant for several years in various matters, including prior criminal proceedings involving charges of aggravated assault and drug possession. During this representation, the law firm acquired significant information about the opposing defendant's activities and lifestyle, information that could have been used against him in a blameshifting defense for the petitioner. The professional duty of confidentiality, of course, would have made such disclosure unethical.

Compounding this conflict were allegations by the opposing defendant in open court that his relationship with the law firm ran deeper than that of attorney and client. At a pretrial severance hearing covered extensively by the media, he alleged that he had been a

close friend of members of the law firm and that they frequently had engaged in criminal conduct with him, including drug use and prostitution. If the law firm chose to present a defense of the petitioner that was antagonistic to their former client, they had good reason to fear that he would continue to make these allegations. At best, these allegations, even if untrue, might damage the law firm's reputation. At worst, they could lead to disbarment and criminal charges. Thus, attacking its former client posed serious risk to the law firm's own interests.

The law firm nonetheless proceeded to represent the petitioner. Not surprisingly, it opted against a defense antagonistic to its former client and alleged criminal co-conspirator. Instead of attempting to shift the blame to this defendant, it immediately announced to the world that its new client, the petitioner, intended to rely on an insanity defense. This announcement clearly implied that the petitioner, and not the co-defendant, had committed the murder. The defense failed. The petitioner was convicted of first-degree murder, a capital offense, and is now serving a life sentence. The other defendant pled guilty to second-degree murder and is now a free man.

More disturbing to this court than the unethical behavior of the lawyers who represented the petitioner is the fact that this case has made its way to our docket. At pretrial proceedings and during the trial itself, the constraints on defense counsel's ability to represent the petitioner zealously became readily apparent, but the trial judge and the prosecutor did nothing. Since the failure of his direct appeal and through new counsel, the petitioner has argued that the law firm's conflicts of interest prevented it from providing an effective defense before no less than four judicial decisionmakers—a state trial judge, a state district court of appeal, a federal magistrate judge, and a federal district judge. None perceived the severity of the law firm's conflicts of interest; none produced a written opinion that suggested that these glaring conflicts received anything but cursory review. We are the first court to give the petitioner's claims close analysis. To this task we now proceed.

## I.

The petitioner, John Freund, appeals the denial of his petition for a writ of habeas corpus by the United States District Court for the Southern District of Florida. Freund was convicted by a Florida state court in 1985 of first-degree murder for the 1984 stabbing death of Ralph Walker. He claimed in his petition to the district court that he was deprived of his right under the Sixth and Fourteenth Amendments to effective assistance of counsel at his trial because his counsel labored under significant conflicts of interest. We agree. Accordingly, we vacate the district court's order denying habeas corpus relief and remand the case with the instruction that the district court issue the writ.

Proper analysis of Freund's claim requires a thorough explication of the facts underlying his conviction and the history of the resulting legal proceedings. In this section, we therefore examine this background in close detail. We first describe, in part A, the backgrounds of the six people who were present at the murder scene: Freund, his co-defendant, three material witnesses from Freund's trial, and the victim. In part B, we relate the gruesome details of the events surrounding the murder. Then, in part C, we describe the police investigation of the murder. We next focus, in part D, on the law firm that represented Freund's co-defendant for several years before the murder trial and subsequently represented Freund at trial. Part E describes the legal proceedings surrounding Freund's prosecution, paying particular attention to the defense strategy of the law firm representing Freund. Finally, in part F, we review Freund's collateral attacks on his conviction, ending with the instant appeal.

## A.

Dr. John Freund practiced oncology, the treatment of cancer, in Palm Beach, Florida. He graduated first in his class from Columbia Medical School and had an excellent reputation in the medical community for both his professional expertise and his personal demeanor. Unknown to most of his colleagues, however, Freund was homosexual and suf-

fered from severe bouts of depression. In June 1983, he attempted suicide by injecting himself with large doses of narcotics, including morphine. A professional colleague and a police officer found him unconscious on the bedroom floor of his Palm Beach residence. After performing CPR to revive his heartbeat, they called an ambulance, which took him to the hospital.

He remained in a coma for several days. Psychological tests and CAT scans of his brain taken after the suicide attempt indicated significant brain damage due to a lack of oxygen. The damage had an effect similar to a frontal lobotomy. Among Freund's symptoms were impaired memory, reduced intelligence, inappropriate behavior, poor judgment, lack of foresight and planning, amenability to influence by others, and a reduced ability to reason and appreciate the consequences of his actions.

After the suicide attempt, the local hospitals placed him on a leave of absence, suspending his hospital privileges. At first, some of his friends in the medical community attempted to help him regain his privileges, but they soon concluded that he lacked the mental capacity to return to his practice. Although he continued trying to regain these privileges, they were never returned. This suspension made practice as an oncologist all but impossible.

Before the suicide attempt, Freund had befriended John Trent, the son of Harriett Trent,[1] one of his patients, and the man with whom he would eventually be charged with murder. Harriett Trent eventually succumbed to cancer some time before the murder. While this friendship soured at some point,[2] it was rekindled after Freund's suicide attempt. He apparently was lured by Trent's promises to help him regain his medical practice. Trent was a "big man" in Palm Beach and was reputed to wield significant, though illicit, influence in the community. Freund's mental condition following his sui-

cide attempt rendered him particularly susceptible to Trent's influence.

John Trent owned a legitimate interior design business called House of Draperies, Inc., but his main occupation was as a full-time criminal. An imposing figure standing about six feet and three inches tall and weighing 230–250 pounds, he was involved heavily in drugs (both use and sale), violence, and prostitution. He owned several rental properties. When his tenants failed to pay their rent on time, Trent had them assaulted.

Trent kept more than one residence in the Palm Beach area and had different girlfriends at various locations, although he was married and had a child. Around the time of the murder, he stayed in a fancy apartment in the Palm Beach Hotel. Although the building had a doorman, someone at the front desk, and security guards, he usually answered his door with a loaded .45 pistol in his hand. When his friends came over, he often would have them immediately use cocaine with him before they did anything else. This behavior became almost ritualistic in the weeks and months preceding the murder. In fact, Trent's demeanor had become increasingly violent and erratic following his mother's death.

Trent claimed to have ties with the local police, working as a confidential informant. He bragged that he had the West Palm Beach Police Department and Palm Beach County Sheriff's Office "in his back pocket." He wielded significant influence over several other people, using them to further his drug dealings, work as prostitutes, entertain him, "take out" those who gave him trouble, and perform various other tasks. Four such people were at Trent's apartment, along with Freund, on the night of the murder: three testified at Freund's trial and the fourth was the victim.

1. For the sake of clarity, we use the name "Trent" to refer to John Trent only. When referring to Trent's mother, we use her first and last names.

2. After receiving his sentence, Freund told the court that two events had led him to end the

friendship before his suicide attempt. First, he had met one of Trent's girlfriends in the emergency room after Trent had beaten her severely. Second, he had attended a party at Trent's house where he saw Trent and several guests openly use cocaine.

Eleanor Mills, a witness in Freund's trial, ran a female escort service[3] and was a frequent drug user. In early 1984, an undercover police officer arrested her after she attempted to sell him a kilogram of cocaine. While in jail following her arrest, she met Rosemary Lail, who was a friend of Trent. Lail told Mills about Trent and suggested that he could help her with the drug charges.

In April 1984, several weeks before the murder, Mills was released on bail and met Trent at his apartment. He answered the door with his gun in hand and they both immediately consumed cocaine. After impressing her with his status in the community, his influence over the police, and his ability to "control things," he offered to help her in at least two ways. First, he referred her to his law firm for legal representation on the matter. Second, he discussed having her serve as an informant with the local police. She and Trent would set somebody up on a drug deal, and she would testify for the prosecution at trial. In the weeks that followed her first meeting with Trent, the two became close, spending considerable time together, mostly using cocaine and drinking alcohol.

Mills' daughter, Lisa Angelilli, also testified at Freund's trial. At the time Mills and Trent became associated, Angelilli was around sixteen years old.[4] Like her mother, she was a frequent drug user. She heard stories about Trent through Mills and was anxious to meet a man of his influence and to use drugs with him.

The other two people present at the scene of the crime served as henchmen for Trent. Bill Daniell was the third material witness at Freund's trial. An ex-convict, he worked at House of Draperies as an electrician and also performed several "odd jobs" for Trent, including drug trafficking. He had known Trent for over thirteen years, and Trent often introduced him as Trent's bodyguard, "killer," or "hit man."

Finally, Ralph Walker was the victim. Walker, an African–American,[5] also performed various tasks for Trent. He would obtain drugs for Trent, collect rent on various properties owned by Trent, and beat up whomever Trent wanted harmed. Walker had a violent temperament and, like Trent, was physically imposing, standing between six feet and six feet and three inches tall and weighing around 250 pounds.

## B.

We turn now to the events surrounding the murder.[6] Most of the relevant events occurred at Trent's apartment in the Palm Beach Hotel. Sometime in the afternoon or early evening of Tuesday, June 24, 1984, Mills and Angelilli arrived at Trent's apartment.[7] Trent, who was in the midst of a cocaine binge that lasted for over a week, had invited them to come over so they could share cocaine, so he could meet Angelilli, and so he could offer Angelilli a job at House of Draperies. As usual, Trent answered the door with his .45 pistol in hand. The entrance to the apartment was through the bedroom. A hallway led from the bedroom

---

3. Trial testimony about her occupation strongly suggested that this business was a front for prostitution. At one point, she recounted that shortly before the murder she agreed to call one of "her girls" to come to Trent's apartment to have sex with the victim. In collateral proceedings subsequent to the trial, both she and her daughter are referred to as prostitutes.

4. By the time she testified at Freund's trial, she was eighteen years old and pregnant.

5. The record does not disclose the race of the other people involved in this case. The racial animus conveyed by Trent's comments, described *infra* part I.B, suggests that he and Daniell, to whom the comments were addressed, as well as Mills and Angelilli, in whose presence the comments were made, are not African–American.

6. We derive the following factual account of Walker's death from the testimony of Mills, Angelilli, and Daniell at Freund's trial. We note where their testimony contained discrepancies. As we discuss *infra*, there are several reasons to question the credibility of these witnesses. Nonetheless, in light of Freund's conviction, we assume the jury believed their testimony, and we accept it as true.

7. The exact time of arrival is unclear. Mills initially told the police they arrived at 3:00 in the afternoon, but at trial she claimed they did not arrive until 6:00 or 7:00 that evening. Angelilli testified that they arrived at 4:00.

to a dining room and living room area (the "main room"), which was adjoined by a kitchen. Trent led them to the main room and immediately had the women snort cocaine with him. They spent the next several hours consuming large amounts of cocaine. Trent was also drinking large quantities of bourbon. He remained armed with the .45 in a shoulder holster; a .357 magnum pistol also lay on the table at which they sat.

Later in the evening, Angelilli announced that she wanted marijuana. Eager to impress Angelilli, Trent called Walker and told him to bring some marijuana over immediately. About thirty minutes later, Walker arrived with the drugs. The partying continued: all four snorted cocaine; Angelilli and Walker smoked marijuana; Trent drank bourbon; and Walker drank tequila. Walker drank and snorted more than the others.

Trent and Walker started to discuss past exploits together. Their voices got louder and Walker started getting excited as they talked about injuring and killing people. During this time, Mills' boyfriend called several times to see what Mills was doing. This angered Trent, and he began suggesting that he would send Walker to attack Mills' boyfriend. Fearing that the boyfriend might show up at Trent's, Mills and Angelilli left Trent's apartment to find him.

When they arrived at Mills' residence, they could not find the boyfriend. They decided to return to Trent's because Angelilli wanted to do more drugs and spend more time with Trent. She was "interested in" Trent and attracted to his lifestyle. Mills did not want to return, but she believed that Angelilli would go back with or without her. Mills agreed to return because she knew that Trent wanted to have sex with Angelilli and she did not want Angelilli alone at Trent's apartment. When they returned, they resumed consuming cocaine. Trent and Walker became increasingly loud as they talked of violence. The escalating level of tension made Mills very nervous.

Sometime around 10:00 or 11:00 that night, Walker began whispering to Angelilli that he wanted to have sex with her. When she ignored him, he got upset, jumped up and exclaimed, "I need some pussy right away

now!" Mills implored Trent to calm Walker down, but Trent assured her that Walker was just "playing around" and would not get out of hand. Trent told Mills to "call up one of your girls and get a black girl over here for Ralph." Afraid to put any of "her girls" in danger, she pretended to make the call and told Trent she could not reach anyone.

Walker became more enraged. He went into Trent's bedroom and came back with an aluminum baseball bat. He slammed the bat onto the table with such force that he put dents in the bat. He announced that Trent would just have to "ignore this," but he was going to have sex with Angelilli. Walker then grabbed the .357 magnum off the table and started toward Angelilli with the gun in one hand and bat in the other. Angelilli and Mills became frightened and tried to hide behind Trent.

Trent reacted by knocking the .357 magnum out of Walker's hand. When Walker reached for the .45 in Trent's shoulder holster, Trent pulled it out first and fired it toward Walker. The bullet hit a dining room chair. Walker had dived over a couch and was on his stomach on the floor when Trent walked around the couch and pointed the gun at Walker's head. He called Walker a "nigger" and threatened to kill Walker immediately.

Keeping the gun pointed on Walker, Trent instructed Mills to get a pair of handcuffs out of his kitchen closet. As she retrieved the handcuffs, she noticed that the closet was full of guns, knives, and pills. Trent had her hold the gun while he handcuffed Walker's hands behind his back. He then told Angelilli to bring him his Gerber fighting knife from the closet. With the knife in one hand and gun in the other, Trent proceeded to kick Walker, lunge at him with the knife, and repeatedly yell threats, including "You're dead Ralph Walker! You're dead, nigger, and you're goin' home to your mama in a box." He also gagged Walker with a towel and strapped duct tape around Walker's mouth.

At this point, Trent called Freund, Daniell, and Bruce Fullerton, another one of his henchmen. He informed Freund that he was

having a problem with Walker and he needed Freund to come over with his "little black bag" to sedate Walker. He told Daniell to come over and bring his "piece." He instructed Fullerton to bring a steamer trunk, a sledge hammer, and a chain saw. Freund and Daniell followed his instructions, while Fullerton apparently ignored them.

Freund arrived first, about fifteen minutes after the phone call. Trent ordered him to sedate Walker. Freund injected Walker with magnesium sulfate from his bag.[8] Daniell arrived shortly after Freund, while Freund was still injecting Walker.[9] When Daniell got close to Walker, he heard Walker mumble through the tape on his mouth, "Don't let them kill me." After multiple injections, Freund ran out of drugs from his bag, but Walker was still conscious. Trent cursed Freund for not bringing enough drugs "to do the job." He remarked to Daniell that Freund's stupidity hampered Freund's chances of becoming a member of Trent's "elite killer squad."

Trent quickly found some Tranxene[10] and Valium[11] in the kitchen closet. He gave Freund the drugs along with a mortar and pestle and a bottle of vodka. Freund crushed the pills into a powder which he dissolved in the vodka. Freund, Trent, and Daniell all took turns injecting Walker with the mixture. After an injection, Walker would lose consciousness for a short time. When he started reviving, one of them would inject him again.

One time when Walker revived, he started groaning loudly. Trent ripped the tape off his mouth. After Walker began to scream, Trent quickly retaped Walker's mouth, also covering his nose. Daniell pulled the tape down so Walker could breathe. During the course of the evening, Trent related to Dan-

iell on more than one occasion that he had always had a fantasy of "killing a nigger" and "fucking him in the ass."

Overcome by these gruesome events, Mills and Angelilli soon retreated to Trent's bedroom. They could still hear Walker groaning in agony, so they begged Trent to let them leave. He refused to allow them to leave the building, but he and a hotel doorman escorted them to another apartment within the hotel. After approximately twenty minutes, the doorman brought Mills and Angelilli back to Trent's apartment. When they returned, Trent told Mills, "We had to take him out. He knows too much and we had to run an air bubble to his vein." Despite this statement, it appears that Walker was still alive when Mills and Angelilli returned to Trent's apartment.

Freund and Trent had indeed injected air into Walker. These injections apparently did not kill Walker right away. Freund told Daniell and Trent that he was surprised they had not caused an embolism. After watching Freund and Trent repeatedly pull the plunger all the way out of a syringe stuck in Walker's arm and then pop the plunger back in to the hilt, Daniell decided he could not watch anymore and joined the women in the bedroom. Freund stayed in the main room with Walker; Trent went back and forth between the main room and the bedroom.

From his vantage point in the bedroom, Daniell saw Freund pick up Trent's fighting knife as if "he had found a new toy" and then walk in the direction of Walker's body. When Trent came back to the bedroom, Daniell asked him what Freund was doing. Trent replied that Freund "was probably

---

8. Magnesium sulfate is a mild muscle relaxer. Oncologists frequently use this drug to treat symptoms arising from chemotherapy and to replenish the body with magnesium, which is lost during the therapy. Expert testimony at Freund's trial suggested that the drug is unlikely to be lethal in the dose Freund was alleged to have administered to Walker.

9. Daniell testified that he was sober when he arrived, but soon joined Trent, Mills, and Angelilli in consuming cocaine. Freund was the only one not using cocaine that night at Trent's apart-

ment. The record does not reveal whether he used cocaine, or any other intoxicant, before he arrived.

10. Tranxene is an anti-anxiety drug that is also used to treat the symptoms of alcohol withdrawal.

11. Valium is a brand name for the drug diazepam. Like Tranxene, diazepam is used to counter the effects of anxiety and alcohol withdrawal.

fucking Ralph in the ass." [12]

At one point, Angelilli walked to the bathroom. On her way, she could see into the main room. She could not see Walker because he was on the floor behind the couch. She could see Freund, however. Freund had the knife in his hand. He was laughing and making up-and-down stabbing motions behind the couch. Although she apparently could not see where the knife landed, she was positive that Freund was stabbing Walker. She then ran into the bathroom and vomited before returning to the bedroom.

Shortly thereafter, when Trent, Daniell, Mills, and Angelilli were all in the bedroom, Freund walked into the room with blood on his shirt and said, "It's over." Trent told him he could not leave wearing the bloody shirt and instructed him to change into one of Trent's shirts. After washing his hands and putting on a clean shirt, Freund started to leave. He warned Mills and Angelilli that they had not seen him there. On his way out the door, he told Trent, "It was a pleasure doing business with you. Call me again." He telephoned about twenty minutes later to inform Trent that he had arrived home safely.

After Freund left, Trent told Daniell that he should make Mills and Angelilli lie face down and then shoot them in the back of their heads because "they knew too much." Daniell convinced him that that was not necessary, and after warning them to keep quiet until he figured out how to proceed, Trent let Mills and Angelilli go home. Daniell stayed with Trent through the next morning. At one point, Daniell saw Walker's body in the living room in a pool of blood. Walker's pants had been pulled down around his ankles.

The next day, Wednesday, Daniell drove Trent around town. They picked up Trent's van from House of Draperies. They returned to the Palm Beach Hotel in the van to retrieve Walker's bicycle, which Walker had left in front of the hotel. After leaving the bicycle at House of Draperies, they drove to the apartment of one of Trent's girlfriends. They made arrangements for the girlfriend and Fullerton to purchase a steamer trunk, which they would use to remove Walker's body from Trent's apartment. At some point, Trent ended up back at House of Draperies.

Later that day, Mills picked Trent up from House of Draperies and drove him to his Palm Beach Hotel apartment. Fullerton soon joined them, and the three began to clean up the apartment, though they left Walker's body on the floor behind the couch. Trent and Fullerton discussed removing the body in a steamer trunk. Mills stayed at Trent's through the night. Freund arrived around two o'clock Thursday morning. Trent, Freund, and Mills sat around the dining room table snorting cocaine, drinking, and talking for several hours. They discussed how they would dispose of Walker's body. Trent also discussed Freund's medical practice. He suggested he would help Freund regain his hospital privileges and declared that he would "own" Freund's practice. During the entire night, Freund had acted oblivious to Walker's corpse still sprawled on the floor. Freund left the apartment sometime early Thursday morning.

The body remained in Trent's living room until Thursday. During this time,[13] Trent threatened to kill Mills and Angelilli if they said anything to the police; he also reminded them that he had the local police under his control. Similarly, Trent threatened to kill Daniell's family if he did not help Trent conceal the body. At one point, Trent told Angelilli that Walker had gotten what he deserved and that he had to die because he knew too much.

Freund returned to Trent's apartment around 10:30 on Thursday morning. He arrived with two young men and one young woman; the four of them stayed in Trent's bedroom, while Trent and Mills were in the main room. Trent told Mills to be sure

12. At Freund's trial, the court instructed the jury to disregard Daniell's testimony recounting this statement as hearsay.

13. The exact days and times of these events are not clear from the record.

Freund's friends did not come into the main room and see Walker's corpse.

Later that afternoon, after Freund and his friends had left the apartment, Fullerton arrived with a sledgehammer and a steamer trunk he had purchased with Trent's girlfriend. Trent used the hammer to break Walker's legs so that his body would fit in the trunk. Once Walker's body was closed in the trunk, Trent, Fullerton, Mills, and another friend of Trent carried the trunk and several items of women's clothing to Trent's van. They were pretending to be moving one of Trent's girlfriend's belongings from the apartment. They loaded the trunk into Trent's van, which they drove to House of Draperies.

### C.

By Saturday, July 28, 1984, the local police had discovered Walker's body in Trent's van at House of Draperies and had begun their investigation. Early that morning, Mills and Angelilli had decided to call the police.[14] They had related the events surrounding the murder and had told the police where to find Walker's body.

Based on Mills' and Angelilli's statements, the police obtained and executed search warrants for House of Draperies and Trent's apartment. At House of Draperies, they found: Walker's badly decomposed body in the steamer trunk in Trent's van; boxes of empty beer cans and liquor bottles; trash bags containing syringes, needle wrappers, empty drug capsules, and four empty ampules of magnesium sulfate. They found fingerprints belonging to Trent and Fullerton on the van, but none belonging to Freund.

At Trent's apartment, the police found: duct tape, a loaded .45 pistol in a shoulder holster, a loaded .357 magnum pistol, a pair of handcuffs, bottles of Tranxene and Valium prescribed for Trent by Freund, a sledgehammer, a dented aluminum baseball bat, a dining room chair with a bullet lodged in it, a Gerber fighting knife with human blood on the blade, a bag of blood-soaked towels, and an empty beer can with Mills' fingerprints. They found no evidence that Freund had been there.

Shortly afterwards, Walker's body was brought to the coroner's office for an autopsy. The coroner examined five stab wounds straight into Walker's chest and one entering his lower back and extending upward and inward toward the heart. The wounds had penetrated Walker's heart. The coroner concluded that these wounds were the cause of death. Injuries to Walker's wrists indicated that he had been handcuffed, and duct tape was found over his mouth. His body fluids revealed high levels of cocaine, alcohol, and nordiazepam.[15] No needle marks were found, but advanced decomposition in one area indicated the possibility that he had received multiple injections. His body was too badly decomposed to determine whether there had been any anal penetration.

After the police discovered the body, Trent fled to Illinois. Daniell eventually approached the police and corroborated Mills' and Angelilli's story. In addition to the physical evidence found at Trent's apartment and House of Draperies, the State thus had three material witnesses willing to testify as to Walker's murder. Although all three witnesses later testified that they had not been offered any deals in exchange for their testimony, none had been charged, as of the time of Freund's trial, with any crime resulting from their involvement in the murder or disposition of Walker's corpse.[16] Mills' co-

---

**14.** They called the vice squad officer who had arrested Mills on the cocaine trafficking charges. They chose him because Trent had earlier told Mills that he did not trust that officer. They thus thought he was unlikely to be under Trent's influence.

**15.** The body converts both diazepam and Tranxene into nordiazepam. Thus, finding nordiazepam in a person's blood indicates that that person had used (or been injected with) diazepam, Tranxene, or both.

**16.** In addition to charges stemming from using and possessing cocaine, each could have been charged with a myriad of crimes for their conduct surrounding Walker's death. For example, all three could have been charged as principals for aiding and abetting Trent's kidnapping of Walker, a first-degree felony, Fla. Stat. ch. 787.01 (Supp.1984), or Trent's false imprisonment of Walker, a third-degree felony, Fla. Stat. ch. 787.02 (Supp.1984). Even if none of them directly participated in Walker's murder, they could still be charged with homicide. If they

caine prosecution had also been delayed until Freund's trial was concluded.[17]

### D.

Sometime after the murder, Freund met with the law firm of Foley, Colton and Duncan, P.A. (the "law firm"), the law firm that would defend Freund at trial. This was not the first time that the law firm and its members became entangled in matters involving John Trent. In fact, the law firm had had extensive dealings with Trent for more than thirteen years.

In the early 1970s, Robert Foley, as a member of the law firm's predecessor, Foley and Brennan, began representing Trent in various criminal and civil matters. Over time Roger Colton and Douglas Duncan joined the law firm, which became Foley, Colton and Duncan.[18] Colton and Duncan also personally represented Trent while

members of the law firm. Until 1984, the law firm represented Trent in various cases and capacities ranging from civil collection actions involving House of Draperies and Trent's hotels to criminal matters.

In addition to representing Trent, the law firm represented Harriett Trent's estate. Trent also referred many of his employees and friends to the law firm. According to Trent, he referred all sorts of people to the law firm, ranging from "the pillars of the community to hookers." Mills and Daniell were among those whom Trent referred to the law firm. Approximately two months before the murder, Mills met with Colton at Trent's Palm Beach Hotel apartment for less than an hour and explained the facts of her cocaine trafficking charges with him. She disclosed her background and prior criminal record and described her relationship with Trent. They discussed the possibility of her providing assistance to the police. The representation appears to have begun and ended

---

were aiding and abetting kidnapping, they could have been charged with second-degree murder. *See* Fla. Stat. ch. 782.04(3) (Supp.1984). If they were aiding and abetting false imprisonment, they could have been charged with third-degree murder. *See* Fla. Stat. ch. 782.04(4) (1983).

Moreover, Mills could have been charged as an accessory after the fact for helping Trent dispose of Walker's body. *See* Fla. Stat. ch. 777.03 (1983) (making it a third-degree felony to assist someone known to have committed a felony "with intent that [the perpetrator of the felony] shall avoid or escape detection, arrest, trial or punishment"); *see also* Fla. Stat. ch. 406.12 (1983) (making it a first-degree misdemeanor to "without an order from the office of the district medical examiner, willfully touch[], remove[] or disturb[ the body of a person who has been murdered], with intent to alter the evidence or circumstances surrounding the death").

Because Daniell admitted to injecting Walker several times, he could have been charged with battery, Fla. Stat. ch. 784.03 (1983), or aggravated battery, Fla. Stat. ch. 784.045 (1983) (battery causing great bodily harm or with a deadly weapon), a first-degree misdemeanor and a second-degree felony, respectively.

Mills and Angelilli could have been charged with the first-degree misdemeanor of giving false information to a law enforcement officer for originally telling the police that they, Trent, Freund, and Walker were the only ones present at the time of the murder (and implicitly that Daniell was not present). *See* Fla. Stat. ch. 837.05 (1983).

Furthermore, because Angelilli was under eighteen years of age, Mills could have been charged with child abuse for permitting by culpable negligence Angelilli to suffer mental injuries, *see* Fla. Stat. ch. 827.04(2) (1983), or for encouraging Angelilli to follow a course of conduct that could cause her to become a delinquent child, *see* Fla. Stat. ch. 827.04(3) (1983).

17. The record does not indicate whether her prosecution was ever resumed. Mills did testify that when she first went to the police, she had discussions with several assistant state attorneys about providing substantial assistance in this case. The fact that she faced a cocaine trafficking charge with stiff penalties was also discussed.

18. The law firm has since dissolved. According to the 1996 edition of the Martindale–Hubbell Law Directory for Florida, Duncan practiced with the law firm of Roth, Duncan & LaBarga. Interestingly, Roth and LaBarga both played key roles in this case. David Roth represented Trent during the murder prosecution. Jorge LaBarga was the assistant state attorney who prosecuted both Trent and Freund.

The September 1996 edition of The Florida Bar Journal indicates that LaBarga and Colton have joined Judge Marvin U. Mounts, the judge who presided over the prosecution of Freund and Trent, on the bench as circuit judges in Palm Beach County. The 1997 edition of the Martindale–Hubbell Law Directory for Florida reveals that Roth and Duncan still practice law together and that Foley is a sole practitioner.

with this meeting.[19] Trent also referred Daniell to the law firm for a traffic violation.

The law firm's relationship with Trent ran deeper than that of attorney and client. Aside from being a client of the law firm, Trent became a fixture around the office. House of Draperies was less than a block away from the law firm's offices. Trent and his employees came to these offices on a daily basis, sharing the law firm's copier and occasionally using other office equipment. Trent also performed interior design work for the law firm's office, as well as for Foley and Colton and the parents of Duncan.

The law firm represented Trent at least until the Spring of 1984, shortly before the murder. In 1983, Trent allegedly brandished a gun on a public street and threatened to kill two people. A few days later, the police spotted him driving and knew he was wanted for assault charges. When they stopped him, they discovered diazepam and methaqualone[20] in his possession. Trent was arrested and charged with drug possession and aggravated assault. The State also initiated a forfeiture proceeding against Trent's automobile in relation to the possession charge.

The law firm represented Trent in both prosecutions, although it withdrew as counsel in May 1984 before the cases were resolved. It filed several pretrial motions and appeared in court for Trent before Judge Mounts, who would later preside over the murder prosecutions of both Trent and Freund. The law firm represented Trent in the forfeiture proceeding, also before Judge Mounts, through final judgment, which issued before May 1984.

The State asserts that the law firm's representation of Trent terminated in May 1984. Freund points to several facts suggesting that the representation may have continued after Walker's murder. Although he had substituted new defense counsel in his assault and possession cases, Trent called Colton to seek legal advice after the murder while he was hiding in Illinois. Colton suggested that Trent was in a lot of trouble and should surrender to the authorities. During a pretrial hearing, Trent testified that he discussed the facts of the murder with Colton on the phone. At an evidentiary hearing following Freund's conviction,[21] Colton admitted that Trent had called him after the murder, but testified that they did not discuss the facts of the murder. In any event, Trent was represented by different counsel throughout his murder trial.

For reasons not revealed by the record, Freund went to the law firm for advice sometime after the murder.[22] The law firm agreed to defend him, and he subsequently surrendered to the authorities at the law firm's office on July 31, 1984. Trent was arrested in Illinois ten days later. Trent and Freund were both held without bond,[23] and both were indicted as co-defendants for first-degree murder on August 23.[24] The prosecution had begun.

---

**19.** Colton testified during a pretrial hearing that he quoted Mills his fee at the end of the meeting and never heard from her again. Mills contended, however, that Colton never mentioned the fee, that Trent told her he had paid Colton a $10,000 fee on her behalf, and that she considered the law firm to be representing her.

**20.** Methaqualone is a sedative also known as Quaalude. Under Florida law in 1983, methaqualone was a Schedule I drug, Fla. Stat. ch. 893.03(1)(d) (1983), and diazepam a Schedule IV drug, Fla. Stat. ch. 893.03(4)(h). Possession of a Schedule I drug with intent to sell was a second-degree felony, while possession of a Schedule IV drug with intent to sell was a third-degree felony. Fla. Stat. ch. 893.13(1)(a)(1), (2) (Supp.1984). Mere possession, actual or constructive, of any controlled substance without a valid prescription was also a third-degree felony. Fla. Stat. ch. 893.13(1)(e) (Supp.1984).

**21.** This evidentiary hearing involved Freund's post-trial collateral challenge, under Fla. R.Crim. P. 3.850, to his conviction. Hereinafter, we refer to the hearing as "the 3.850 hearing." We discuss the proceedings surrounding the 3.850 hearing *infra* part I.F.

**22.** Freund indicates in his petition that the law firm was "recommended" to him, but he does not indicate by whom.

**23.** According to testimony elicited at the 3.850 hearing, Trent was held without bond because he had threatened to kill Angelilli.

**24.** Florida's murder statute defines murder in the first degree, a capital offense, to include a premeditated killing and a killing "committed by a person engaged in the perpetration of, or in the attempt to perpetrate," one of a list of enumerated felonies, including kidnapping. Fla. Stat. ch. 782.04(1)(a)(1), (2)(f) (Supp.1984).

Both the law firm's new client, Freund, and its longtime former client and friend, Trent, faced the possibility of the death penalty for the gruesome, drug-related murder of Ralph Walker. All the physical evidence pointed to Trent as the murderer, and no physical evidence implicated Freund at all. The only witness who claimed to have seen Freund actually commit the murder was Angelilli, a sixteen-year-old girl who had been high on cocaine and marijuana at the time of the murder. The law firm knew that Trent had a history of arrests for violent assault and possession of the same drug found in Walker's body: it had defended him on these exact charges just a few months earlier. Although the circumstances of the case strongly suggested that any defense of Freund would involve implicating its former client to some degree,[25] the law firm proceeded to defend its new client.[26]

This conflict all but ensured a dramatic prosecution, especially in light of widespread media attention drawn by the sensational nature of the case. Many questions demanded answers, not the least of which was whether the law firm would seek to shift the blame to its former client or would instead present a defense somehow consistent with the interests of both its new client and its former client.

### E.

The law firm did not take long to provide an answer. Two or three days after Freund was arraigned, Foley called a press conference to announce that Freund would rely on an insanity defense. Implicit in this announcement was an admission that, despite the paucity of evidence against him, Freund had killed Walker. Such a defense, if proven to a jury, could relieve both defendants of liability for first-degree murder: Trent could be found not guilty because he did not commit the murder,[27] and Freund would be found not guilty because, although he committed the murder, he was insane.

The case was eventually assigned to Judge Mounts,[28] who had earlier presided over

---

**25.** Even if Freund's defense did not seek to exonerate Freund by inculpating Trent, the capital nature of the prosecution made it almost inescapable that, if convicted, Freund would have to try to shift the blame to Trent. If found guilty of first-degree murder, Freund would surely argue that at least two statutory mitigating factors applied and that the death penalty thus would be inappropriate. *See* Fla. Stat. ch. 921.141(6)(d) (1994 Supp.) (providing mitigating factor when "[t]he defendant was an accomplice in the capital felony committed by another person and his participation was *relatively* minor" (emphasis added)); Fla. Stat. ch. 921.141(6)(e) (providing mitigating factor when "[t]he defendant acted under extreme duress or *under the substantial domination of another person*" (emphasis added)).

After Freund was convicted of first-degree murder, the penalty phase of the trial was convened to determine whether he should be put to death. The record before us does not include the transcripts from Freund's sentencing hearing, but we assume the law firm argued that both circumstances were present. The jury recommended a life sentence, not the death penalty.

**26.** The $75,000 fee paid by Freund's family may have helped blind the law firm to the conflicts.

**27.** Trent would not be guaranteed an acquittal on first-degree murder charges. He could still be found guilty of the capital offense as an accessory before the fact if, along with helping Freund kill Walker, he intended that Freund kill Walker.

*See* Fla. Stat. ch. 777.011 (1983). He could also be found guilty of first-degree felony murder, even if he did not commit the killing. *See Cave v. State*, 476 So.2d 180, 186 (Fla.1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). To get the death penalty for felony murder, however, the State would have had to prove that Trent acted either with the intent that Walker die, *see Enmund v. Florida*, 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), or with reckless disregard for Walker's life, *see Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987).

Even if the State proved the requisite intent, a finding that Freund did the killing would mitigate against the death penalty for Trent. *See* Fla. Stat. ch. 921.141(6)(d). The point is that the chance that Trent would be convicted on capital charges *and* put to death was greatly diminished by Freund's implicit admission that he killed Walker.

**28.** The case originally was assigned to Circuit Judge Tom Johnson, who then recused citing a previous professional relationship with Trent's deceased mother. Harriett Trent was a legislative delegate secretary at the time Judge Johnson was a state senator. He also worked with her in his judicial capacity when she became a secretary to the Court Administrator of Palm Beach County. Judge Johnson recused because he was "well acquainted" with Harriett Trent and because he predicted that "it would be difficult to be impartial in this matter."

Trent's assault and drug prosecutions as well as the forfeiture proceeding. After several hearings to determine Freund's competency to stand trial, Judge Mounts declared him competent on February 5, 1985. Not surprisingly, it did not take long for two conflict issues to arise during pretrial proceedings.

The first issue arose at a deposition on April 16, 1985. Mills refused to answer any questions posed by Duncan on the ground that her consultation with Colton regarding her cocaine trafficking charges had established an attorney-client relationship with the law firm. As a result of this relationship, she asserted that any questioning of her by Duncan, or any other member of the law firm, on Freund's behalf would conflict with her attorney-client privilege. She admitted that she had disclosed to Trent's counsel, in the course of the deposition, everything she had discussed with Colton.

The second conflict issue arose less than a month later. On May 13, 1985, the law firm filed a motion to sever on behalf of Freund, asking the district court to sever the case so that Freund and Trent would be prosecuted in separate proceedings.[29] The law firm noted that if Trent decided to testify on his own behalf, it would be faced with a decision of whether and how to cross-examine its former client. A severance should be granted, the law firm reasoned,

> to avoid even the remotest scintilla of an appearance of impropriety. This is not to say that an appearance of impropriety exists. Instead, there appears to be no provision contained in *The Code of Professional Responsibility* that prohibits a lawyer/law firm from undertaking representation of a new client who is charged

with a criminal offense along with a former client.

The motion concluded with a statement that an informal written opinion addressing the possible conflict had been requested from The Florida Bar. The record does not disclose whether Judge Mounts ever issued a final ruling on this motion.

In light of the conflict issues raised by Mills at her deposition and by the law firm in Freund's severance motion, Duncan wrote a letter to The Florida Bar on May 13, 1985, requesting an informal opinion on both issues. As to the law firm's prior representation of Trent, Duncan asked two related questions: (1) whether the law firm ethically could defend Freund while Trent was a co-defendant in the same trial; and (2) whether "there [is] anything ethically wrong with arguing in a separate trial, that a former client is responsible for a homicide as opposed to the new client." His request did not detail the law firm's relationship with Trent beyond a statement that Foley and Colton had "represented [Trent] in the past on various legal matters, including criminal charges. Clearly, the prior representations of [Trent] are in no way connected to the instant homicide." As to Mills' refusal to answer questions posed by the law firm, Duncan inquired whether "there [is] anything by virtue of the one initial consultation with Ms. Mills, that would preclude my law firm from examining and questioning Ms. Mills concerning her knowledge of the homicide."

Duncan received a response on May 31, 1985. Dennis Crowley, Ethics Counsel for The Florida Bar, issued an advisory staff opinion (the "Bar opinion").[30] Regarding the

---

**29.** This motion was actually the second such motion filed on Freund's behalf by the law firm. It filed the first motion on February 21, 1985. The initial motion was based on a statement Trent made to the media. He announced on television that he was present when Walker was killed and he saw Freund kill Walker. Although this statement might be admissible against Trent, admission of the statement in a trial in which Freund was also a defendant would violate Freund's constitutional right to confront his accusers. *See Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1627–28, 20 L.Ed.2d 476 (1968).

Although the record does not contain Judge Mounts' ruling, statements made by Duncan at subsequent proceedings indicate that Judge Mounts ruled that he would grant the severance if the State intended to use this statement at trial. Because Judge Mounts did not grant a severance based on this motion, we assume that the State repudiated any intention to use the statement at trial.

**30.** This opinion is replete with typographical errors. For example, instead of referring to Freund, Mills, and Trent by name, Crowley refers to them as "X," "Y," and "Z." Unfortunately, the opinion appears to lose track of which letter

law firm's prior representation of Trent, the Bar opinion did not offer a direct answer to either question posed by Duncan. Perhaps wary that he did not have sufficient details of the law firm's representation of Trent, Crowley merely outlined some relevant considerations in the abstract. The Bar opinion stated:

> [W]here the matter [in which an attorney represented a former client] is so unrelated, as to either substance or time, that the attorney could not have acquired information [from] the former client which could be used to his detriment, the attorney may ethically undertake representation adverse to his former client. If such related information was acquired during the course of former representation, [Florida's Code of Professional Responsibility] would prohibit the proposed representation even if a severance of the former and present clients' cases were granted. Therefore the responsibility of the former client in the present case could only be argued where no detrimental information was obtained in the previous distant or unrelated representation.

As to whether the law firm could question Mills about the homicide, the Bar opinion suggested that it could as long as its questioning did not reveal any confidences or secrets between the law firm and Mills. It seemed to warn that, if Mills' consultation with the law firm was either close in time to the homicide or related to the homicide, the law firm would be prohibited by Florida's Code of Professional Responsibility from questioning Mills concerning the homicide.[31] The Bar opinion also warned Duncan that the conflict "has potential for violating" ethical rules requiring the law firm to represent Freund zealously within the bounds of the law.[32]

On June 3, 1985, Duncan filed a motion seeking an order from Judge Mounts that Mills submit to a deposition by the law firm. In support of his motion, he attached the Bar opinion, which he summarized as follows: "In essence, The Florida Bar has advised the undersigned law firm, that there are no ethical problems in examining Ms. Mills concerning her knowledge or lack of knowledge about the homicide giving rise to the charge of first degree murder [against Freund]." Duncan assured Judge Mounts that the law firm would "maintain the confidences and secrets that may have been disclosed by Ms. Mills to Mr. Colton during their initial consultation on the unrelated criminal charge." He went on to state that, because the murder occurred after the consultation, the law firm would not be prohibited from questioning Mills about her "observations and opinions concerning the alleged homicide." [33]

On August 20, 1985, Trent filed a motion to sever on two grounds, only one of which is relevant to the instant case.[34] The main

---

represents which person. Despite the ambiguities, we believe the summary of the opinion that follows is the most reasonable interpretation.

**31.** Unfortunately, the language of the opinion is particularly ambiguous on this point. The opinion's penultimate sentence, which addresses Mills' claim, contains an ambiguous double negative: "[I]f the single consultation did not involve *any* information which were [sic] not distant in time or unrelated to the present capital case, the inquirer's firm would be precluded from examining 'Z' concerning the homicide."

Crowley apparently later "clarified" this sentence by indicating that the word "not" should be inserted before "be precluded from." This amendment, of course, only served to further obscure the opinion's meaning.

**32.** The clear suggestion of this warning was that if the prior representation of Mills restricted the law firm's ability to question her regarding the homicide, then the law firm's ability to zealously represent Freund would have also been restricted.

**33.** The record does not reveal whether Judge Mounts granted this motion, but Mills did submit to examination by Duncan on June 24, 1985. Duncan began his examination of Mills by stating that The Florida Bar had "indicated that we have no conflict in questioning you with whatever you may or may not know concerning the homicide of Ralph Walker."

**34.** As with Freund's first severance motion, *see supra* note 29, the other ground in Trent's motion involved a *Bruton* issue. Freund had told one of his psychiatrists that he had killed Walker, but only because Trent told him to. The law firm intended to introduce this statement through the testimony of the psychiatrist to support the insanity defense.

Judge Mounts ruled that the statement would not be admissible at trial. Because this ruling

ground involved the conflict arising from the law firm's relationship with Trent: the law firm had acquired confidential information that it could use to Trent's detriment at trial. Despite his previous motions to sever, Freund initially joined the State in opposing Trent's severance motion.[35]

Judge Mounts conducted a hearing on Trent's severance motion on September 3, 1985, the day jury selection for the trial was scheduled to begin. The hearing was open to the public and apparently drew a significant amount of media attention. Trent testified on his own behalf at the hearing. He began his testimony by detailing the attorney-client relationship that had developed between the law firm and him. During the course of the representation, Trent had confided his personal secrets and business affairs to both Foley and Colton. After the law firm had advised him that all communications would be completely confidential, Trent admitted his participation in multiple criminal activities involving drugs and prostitution. Although he had previously obtained substitute legal counsel for the drug and assault prosecutions, he called Colton, in lieu of the substitute law firm, after the murder. He did this because he felt Colton was still his attorney, because of his long-term relationship with the law firm, and because of his understanding of the attorney-client privilege.

His testimony soon moved from his professional relationship with the law firm to a more personal and lurid relationship. He

had considered Foley and Colton to be close friends in addition to his legal counsel. Beyond discussing his criminal activities, Trent had recounted the details of his sexual exploits and interests to both lawyers. He told them about his use of "sexual devices," including whips, chains, dildos, and handcuffs, and showed these devices to them at his Palm Beach Hotel apartment on several occasions. He also claimed to have used cocaine and other drugs in their presence, including in their office.

As he developed his testimony, he soon made clear that Foley and Colton did more than listen to his tales of deviancy. With the media recording his every word, Trent made several serious allegations against both lawyers. He claimed to have delivered cocaine to their friends, sometimes at the law firm's offices. He suggested that he had provided both men with prostitutes on many occasions, often as payment for legal services. Trent allegedly provided Foley with "so many [prostitutes] over the years ... it [was] almost a daily occurrence." He alleged that the two attorneys had attended and participated in many of his "sex parties" involving cocaine and prostitutes.

One particularly inflammatory allegation involved a sex party at the law firm's offices. He and Foley allegedly invited several prostitutes to the offices after hours. One of them accidentally tripped the burglar alarm, which was monitored by the police. When

---

resolved the *Bruton* problem, he denied the motion for severance on this ground.

35. Trent had also moved on August 20, 1985, for Judge Mounts to recuse himself from Trent's prosecution on several grounds. First, Trent asserted that he and the judge shared a close friend who had told Judge Mounts that Trent used illegal drugs. Second, before the murder and prior to Trent's arraignment on possession charges before Judge Mounts, former sheriff William Heidtman had contacted the judge on Trent's behalf. At the arraignment, Judge Mounts angrily scolded Trent, "I didn't appreciate being called this morning by Mr. Heidtman." Trent also based the motion on three statements made to him suggesting that Judge Mounts was biased against him. First, after a plea conference in the possession case, Colton, who was still representing Trent at the time, told him that Judge Mounts hated him and that "they'll work it out some way so that Mounts will

be your Judge." Second, while working for the administrator of the Circuit Court for Palm Beach County prior to her death, Harriett Trent had informed Trent that she and Judge Mounts hated each other. Finally, Fullerton, who was listed as a State witness, had told Trent's new counsel that Colton had told Fullerton that Judge Mounts wanted to handle Trent's murder trial and hoped that the State would seek the death penalty.

Apparently, another circuit judge subsequently determined that the motion should be denied. At any rate, on August 20, the State entered into a stipulation with Foley, as counsel for Freund, that Freund's trial date be stayed pending resolution of Trent's motions for severance and recusal. The stipulation stated that it was the position of the State and of Freund that "no legal grounds exist for the granting of the severance" and that both defendants should proceed to trial together.

the police arrived, Trent recounted that he had to answer the door because Foley had no pants on.

These dramatic allegations caused a considerable stir in the courtroom, and Judge Mounts called a recess to give the law firm an opportunity to prepare its strategy in response. During this recess, Duncan and Freund left the courtroom and met privately in a holding cell to discuss the allegations.[36] Duncan described the allegations as "appalling" and "shocking" and told Freund that "if your faith in our law firm to represent you is in any way shaken, I will go back in there with you to get you new lawyers." Freund responded that he felt the allegations would make the law firm represent him even more zealously than before.

After the parties returned and the hearing resumed, Trent's counsel called Colton to the stand.[37] Colton flatly denied the allegations against him. At the end of Colton's testimony, Judge Mounts personally questioned him from the bench. He elicited that Colton was an upstanding member of The Florida Bar, enjoyed a solid reputation for fairness and professionalism, and had served on several bar committees involving issues ranging from legal ethics to judicial appointments. Judge Mounts ended his rehabilitation of Colton with a remark to everyone in the packed courtroom suggesting that he hoped they all understood Colton's excellent reputation.[38]

At the conclusion of the severance hearing, the law firm announced that it had again changed its position on severance. Despite its earlier opposition to Trent's motion, it stated that developments at the hearing had led it to agree that a severance was in Freund's best interest. After asserting that "the bottom line" of the Bar opinion was that there was no conflict, Duncan finally conceded that "the delicate nature" of the ethical rules pertaining to conflicts of interest made cross-examination of Trent by the law firm inappropriate.[39] The State continued to oppose severance, relying in large part on the Bar opinion, which it described as "stating that there was no conflict of interest."

These proceedings eventually convinced Judge Mounts to grant the severance.[40] Trent went to trial first. After his trial resulted in a hung jury, the State dropped the capital charge and he pled guilty to second-degree murder. Trent received a seventeen-year sentence and, according to Freund's initial brief in the instant appeal, has since been released.[41]

On October 21, 1985, Duncan filed a Motion to Disclose Confidential Informant. The motion stated that Duncan had received an anonymous tip that a confidential informant for the police had discovered corpses buried under House of Draperies. The motion indicated that "such evidence ... would be relevant and admissible 'Williams Rule' type evidence for the defense to establish that it was

---

**36.** We derive the details of this conversation from Duncan's testimony at the 3.850 hearing.

**37.** Trent's counsel also attempted to call Foley. Foley resisted being called as a witness because he was representing a party. Judge Mounts agreed and did not allow Trent's counsel to put Foley on the stand. He stated that Colton could testify because, although he was in the same firm as Duncan and Foley, he had not taken an active role in Freund's defense.

**38.** After Judge Mounts asked Colton about Colton's various bar-related activities, the following colloquy ensued:

> THE COURT: Would it be a fair statement that serving the Bar, that members of the Bar, the lawyers, seek only those lawyers who are most trusted and respected by other lawyers with matters as sensitive and hopefully as important as the discipline of attorneys and the selection of lawyers to serve the public as Judges?
> Is that a fair statement?

> THE WITNESS: Yes, sir, it is.
> THE COURT: Did everybody out there get that?

**39.** Duncan also favored severance in light of Judge Mounts' ruling that the testimony of Freund's psychiatrist, discussed *supra* note 34, would be inadmissible. He complained that the ruling would "take the heart out of our psychiatric defense."

**40.** He initially denied the severance. After counsel for both Freund and Trent argued the centrality to Freund's defense of Freund's statement to his psychiatrist that Trent had told him to kill Walker, a statement that would be inadmissible in a joint trial under *Bruton*, Judge Mounts changed his mind and granted the severance.

**41.** The record does not contain the transcripts of Trent's trial and reveals no further direct involvement by Trent in Freund's prosecution.

John Trent who actually murdered Ralph Walker."[42] The record does not reveal whether Judge Mounts ruled on the motion. At any rate, the law firm presented no evidence at trial suggesting that Trent, not Freund, was the actual killer.

Jury selection for Freund's trial began on October 21, 1985, and the trial itself commenced on October 23. Duncan and Foley both represented Freund at trial. The State first introduced most of the physical evidence through the testimony of various police officers who conducted the investigation. The State also presented the results of Walker's autopsy, through the testimony of the pathologist who conducted it.

Through the testimony of Mills, Angelilli, and Daniell, the State next presented the details of the murder. Although there were minor inconsistencies, the three witnesses essentially recounted the events leading up to and following Walker's murder, as described *supra* part I.B. They all testified that Freund was present at Trent's apartment the night of the murder and that, at Trent's direction, he injected Walker first with magnesium sulfate, then with mixtures of vodka and Valium and vodka and Tranxene, and finally with air. Angelilli was the only witness to testify that she thought she saw Freund stabbing Walker.[43] All three testified that Freund was

alone in the main room with Walker for a short time, after which he came into the bedroom with blood on his shirt. After describing their role in helping Trent clean up and move Walker's body, the witnesses each concluded their direct testimony by recounting how and why they went to the police.

Duncan brought out many of the inconsistencies of each witness' testimony on cross-examination. For example, he elicited from both Mills and Angelilli that when they originally went to the police, they made no mention of Daniell at all. They explained that they were afraid to inculpate him because they thought he was a hit man who would kill them. They did not acknowledge that he was present that night until after he had gone to the police.

While cross-examining Mills, Duncan asked a series of questions about how she came to know Trent and about her prior arrest on cocaine charges. Specifically, he had her recount the basic background of the offense and Trent's assistance from her arrest almost all the way to her meeting with Colton. Perhaps realizing that this line of questioning came very close to highlighting the law firm's prior involvement with Trent, Duncan moved to another topic before reaching Mills' consultation with Colton.[44]

---

42. We presume that Duncan is referring to the Supreme Court of Florida's holding in *Williams v. State*, 110 So.2d 654 (Fla.), *cert. denied*, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), that evidence of other crimes is admissible and relevant if it tends to show a common scheme or plan.

43. As mentioned earlier, she only saw Freund make stabbing motions in the direction of Walker's body. Because Walker's body was behind a couch, she did not directly see Freund plunge the knife into Walker's body. Daniell also testified that he saw Freund pick up Trent's knife and approach Walker, but he did not see Freund stab Walker.

44. Because this questioning sheds light on the effect of the law firm's prior representation of Mills on its performance at trial, we find it useful to reprint the relevant portions of Duncan's extensive line of questioning.

Q You testified to this jury that you heard of or you learned about John Trent while you were in the Palm Beach County jail?
A Yes.
Q Through a Rosemary Lail?

A Yes.
Q Okay. And what Rosemary Lail told you was, "Listen, you're looking at some big time and a fine and the guy you want to see in town is John Trent"?
A Yes.
. . . .
Q And you had been arrested, I think you told the jury, for trafficking in cocaine?
A Yes.
Q You tried to sell some police officers cocaine?
A I was like the middle person.
Q Okay. How much cocaine were you trying to sell?
A Four kilos. That's what he requested, [the police officer] requested and he received one kilo.
Q How much is a kilo of cocaine, Ms. Mills?
A Two pounds.
Q I'm sorry, the price?
A The price? About thirty-seven thousand I think the price was.
Q That's what you were selling it for, thirty-seven thousand?
A Yes.

On cross-examination of each of the three witnesses, Duncan elicited personal facts tending to detract from their credibility. He questioned Mills about "Port O Call for Men," the escort service she ran. The questioning strongly implied that the service was a front for prostitution. During his cross-examination of Angelilli, Duncan elicited that just prior to the trial, Angelilli had worked as a topless dancer. While cross-examining Daniell, he elicited that Daniell was an ex-convict. Daniell also admitted to having said he "would never go back to prison except on a slab."

After the State rested, Foley and Duncan presented Freund's insanity defense. Through the testimony of several witnesses, they demonstrated that Freund had a good

Q And you told this jury that you understood that what you had been arrested for carried with it a fifteen year mandatory minimum sentence?
A Yes.
Q You understood that if you were guilty and convicted of that, that you would do day for day fifteen years?
A Yes.
Q You were also aware that that carried with it in addition to the fifteen years a quarter of a million dollar fine?
A Yes.
Q So as a result of your conversation with Rosemary Lail, you were looking forward to meeting this guy who was going to get you out of a fifteen year prison sentence and a quarter of a million dollar fine?
A I wasn't sure he was going to get me out.
Q I understand that. But you certainly were going to check it out?
A I was going to check it out, yes.
Q In fact the first time you got out of jail, John Trent sent a cab for you, didn't he?
A Yes.
Q And he paid for the cab to bring you to the Palm Beach Hotel?
A Yes.
Q Tell the jury, Ms. Mills, the first thing that you said and did when you arrived at John Trent's apartment the day you got out of jail in the cab that he paid for.
A I went into the apartment. Rosemary Lail was there, John Trent was there and the first thing he did was lay out some cocaine.
Q You did it?
A Yes.
Q The first thing off the bat?
A Yes.
Q The moment you get out of jail ... you're doing cocaine?
A Yes.
Q And did John Trent then begin to talk to you about a term we use down here in the courthouse, "substantial assistance"?
A I don't know if he mentioned that term or not but he did say he could help me.
Q Okay. He may not have used the legal terminology, "substantial assistance," but he explained to you, "Listen, Eleanor or Ms. Mills," whatever he called you, "the only way you're going to get out from under this fifteen year mandatory minimum sentence and a quarter of a million dollar fine is to work with me"?

A That's what he said, yes.
Q Okay.
A He needed help also.
Q What do you mean he needed help?
A He was an informant. He was an informant for the law so he needed something too. He needed some assistance also. It would help him and Rosemary Lail and myself.
. . . .
Q Okay. You talked about what it was though, substantial assistance, whereby you would work with the police to set somebody up?
A We talked about it, yes.
Q Well, you talked about the mechanics of it?
A Yes.
Q You would set somebody up, get them involved in a drug deal?
A No. He was going to set someone up.
Q He, being who?
A John Trent.
. . . .
Q But the mechanics of it, Ms. Mills, and correct me if I'm wrong, was that John Trent using you would set somebody else up in a drug deal and they would get arrested and then you would help the Prosecutor and the State and you would get out of your problem?
A That's what he was saying.
Q Okay. Now, John Trent told you that he had what, the West Palm Beach Police Department in his back pocket?
A Yes.
Q That he had the Palm Beach Police Department in his back pocket?
A Yes. He had them all. He said he had a good rapport with them.
Q Okay. And John Trent set himself up to you as being the big man?
A Yes, he did.
Q He could control things?
A That's how it came off to me, yes.
Q The first day you came out of jail and went there, he told you, "Don't worry about it, Ms. Mills, I'm going to handle things for you"?
A Yes.
Q That was a great relief to you, wasn't it, ma'am?
A No. Because I listened to him but I told him that I didn't believe it until I seen it.
Q But you weren't the least bit relieved or encouraged that you were going to get out of this fifteen year mandatory sentence and quarter of a million dollar fine with what he said he was going to do for you?
A I felt more comfortable, yes.

reputation as an oncologist before his suicide attempt. They developed the facts surrounding the suicide attempt, focusing on the changes in Freund's personality caused by the resulting brain damage. Colleagues of Freund testified that he seemed to be a different person with severe memory problems. The defense moved to the testimony of several experts who explained the symptoms caused by the brain damage, including susceptibility to suggestion and a lack of independent judgment. Many of these experts had evaluated Freund shortly after his suicide attempt to determine whether or not he was fit to return to the practice of medicine.

During its cross-examination of Freund's witnesses and through the testimony of the witnesses it called on rebuttal, the State attempted to demonstrate that Freund knew what he was doing when he killed Walker and knew that it was wrong. When cross-examining one of the psychiatrists called by Foley, the State elicited that Freund had told the psychiatrist that he remembered the events of the night of the murder. Specifically, the jury heard the psychiatrist confirm that Freund had admitted to remembering the following: Trent called him to come over and kill Walker. When he arrived at Trent's apartment, Walker was lying on the floor in handcuffs. He injected Walker with Demerol [45] and Valium, knowing that these drugs would not kill Walker. He stabbed Walker several times with a letter opener. He did not know who Walker was when he stabbed him. He first stabbed Walker in the back, but then turned him over to stab him in the heart because, as a doctor, he knew that was the way "to really kill a person that is in handcuffs."

Neither Duncan nor Foley objected to this line of questioning. Judge Mounts did instruct the jury, on more than one occasion, that Freund's statements to psychiatrists may be treated "as evidence of mental condition only and not as evidence of the factual truth which may be contained in them."

The State called its own expert witness on rebuttal, a psychiatrist who had been appointed by the court to determine Freund's competency to stand trial. This expert witness testified that his observations of Freund led him to believe that Freund was feigning most of his mental problems. He suggested that Freund committed the murder as an act of "homosexual perversion." He claimed that although the stabbing may have been the result of an "irresistible impulse," Freund definitely knew that he was killing Walker and knew that what he was doing was wrong.[46] The witness further commented on the reports prepared by the psychiatrists that had examined Freund to determine his competency to return to the medical practice. He interpreted those reports as indicating that Freund's condition was improving and that Freund might have been able to return to the practice of medicine. He suggested that the psychiatrists who testified on Freund's behalf had exaggerated in attempting to characterize the reports as supporting Freund's insanity defense.

The last witness called by the State on rebuttal, and the last witness of the entire trial, was James Stob, a friend of Freund. Stob testified that he had seen Freund a week or two before the murder. They saw each other in their cars while stopped in traffic and exchanged small talk. After reading about the murder and Freund's arrest in the newspaper, Stob had gone to see Freund

**45.** Demerol is a brand name of meperidine hydrochloride, a narcotic, similar to morphine, used to control moderate to severe pain, usually following surgery. No other testimony or physical evidence suggests that Walker was injected with Demerol.

**46.** Although many states provide an insanity defense for crimes committed as the result of an irresistible impulse, see, e.g., Model Penal Code § 4.01(1) (1995) (providing insanity defense where "as a result of mental disease or defect [the defendant] lacks substantial capacity to ... conform his conduct to the requirements of the

law"), the Supreme Court of Florida has rejected this test explicitly. See Wheeler v. State, 344 So.2d 244, 245 (Fla.1977). Florida law provides the defense of insanity where

> at the time of an alleged crime a defendant was by reason of mental infirmity, disease or defect unable to understand the nature and quality of his act or its consequences, or if he did understand it, was incapable of distinguishing that which is right from that which is wrong.

Id. at 245 n. 2.

in jail. He testified that Freund denied killing Walker.

The final testimony heard by the jury was Stob's testimony on cross-examination by Duncan. Duncan pursued two strange lines of questioning, both relating to Stob's opinion of Freund's legal representation. Duncan first elicited that when he visited Freund in jail, Stob had recommended that Freund hire another attorney. After several somewhat argumentative questions on this recommendation,[47] Judge Mounts sustained an objection by the State on relevancy grounds. Duncan then proceeded to elicit that Stob had disagreed with the law firm's decision to pursue an insanity defense from the beginning of its representation of Freund.[48] Judge Mounts again sustained an objection by the State, this time on grounds that the line of questioning was argumentative. Dun-

can had no more questions and Stob stepped down. The State rested its case in rebuttal, and Judge Mounts excused the jury for the day while the lawyers argued over the jury instructions.

The closing arguments focused on Freund's insanity at the time of the murder. The State argued that Freund knew exactly what he was doing and that he falsely tried to convince his psychiatrists that he was insane. It argued that Freund was guilty of first-degree murder under either of two theories: (1) the murder was premeditated; or (2) the murder was committed while Freund was engaged in the felony of kidnapping.

Duncan focused on Freund's brain damage and the testimony of the psychiatrists called on Freund's behalf, arguing that Freund either did not know what he was doing when

47. The line of questioning proceeded as follows:

Q Okay. And there came a time, whether it be that day or a subsequent occasion, that you recommended an attorney to John Freund?
A No, I did not. Strike that.
On that very day, I believe I asked if he had an attorney and he mentioned he had one. I was not aware of the name of the attorney or anything.
I said, "Would you be interested in us trying to help you find an attorney?"
Q And one of the attorneys you wanted to recommend was a guy named Ellis Rubin from Miami?
A That's correct.
Q You knew of Ellis Rubin's reputation of being one of an artist, one who can go off and search great new precedents, isn't that true, Mr. Stob?
A I understand him to be an artist, yes. A very fine, respected attorney.
Q Well, haven't you previously told me in a deposition, without referring to it per se, that you had recommended Ellis Rubin, this attorney in Miami, because he was an artist who could come in and talk to the jury?
A I will quote what I said to you, sir. I said he completed a case in the old Clarence Darrow style.
Q And he was not afraid to go off and search for new precedents?
A Possibly, yes.
Q Ellis Rubin....
At this point the State objected, ending the line of questioning.

48. Again, we quote the odd line of questioning. Although Duncan and Stob use the word "incompetency," we think an ordinary juror would understand this line of questioning to be referring to the law firm's decision to present a defense based on insanity.

Q There came a time when you heard that John Freund was going to be declared incompetent, didn't you, sir?
A I read that too, sir.
Q You couldn't believe that?
A I had a hard time believing the attorney would come out and tell the press they were going to plead incompetency immediately after meeting him.
Q Because in your mind that is as good as saying the client did it, isn't that true?
. . . .
A No, it is not. But it is what people assume when they read it.
Q That is what you thought at the time, isn't it, sir?
A No, it is not. No, I was upset because I understand when people read it, a lot of times they don't read it fully or they don't understand the pleading of a case of incompetency.
I understand when people read, oftentimes their first impression is their last impression and I merely thought, "Gosh, if I was John's attorney, I would have said at first no comment, I don't know enough about the case yet."
Q Haven't you previously told me in a deposition, sir, . . . "If I am reading and I see he made a claim of incompetency, that is as good as saying my client did it, now, how do I get him out?"
A Yes. Yes, I said that but I was not referring to myself, I was referring to the general public reading the newspaper.
Q There is something wrong with people who are honest from the outset and say, "Maybe your client is incompetent or insane," instead of playing the game?
The State objected at this point, and Duncan had no further questions.

he stabbed Walker or, if he did know what he was doing, did not know that it was wrong. Duncan asserted that there were two victims in the case—Walker and Freund. He argued that Trent knew that Freund's condition left him susceptible to influence and that Trent accordingly manipulated and controlled Freund, making him kill Walker.

At one point, Duncan turned the argument over to Foley. After arguing that there was reasonable doubt as to Freund's sanity, Foley then took an entirely different approach. Although the defense position throughout the proceedings, from opening statements through most of the closing argument, had been that Freund committed the murder but was insane, Foley questioned for the first time whether Freund actually committed the murder. Foley told the jury:

> [Freund] was told to do something. He did it, and because of the stressful situation, Ralph Walker is dead. We don't really know who did it. I always wondered whether Trent did it and told this poor guy, "You did it. My colleagues here are telling you you did it."

> The same girls were lying when they told the police they didn't even tell them about Daniell in the sworn statement. The woman is going to get fifteen years mandatory without parole lifted for her if she cooperates, but she lies, she is in trouble and she lied about Daniell and Daniell got the word and he figured he better get in on the train also so he runs down to the police station Tuesday, I think it was, after the murder, and gives his statement and they say okay.

> Remember, he lied about that so we don't know what happened there. We can't guess what happened. We can't

guess this man into the electric chair and we can't guess him into 25 years in the penitentiary without parole.

Foley then returned to the insanity defense and soon ended his argument. In the State's closing argument, in addition to refuting the insanity defense, the State addressed Foley's statements: "Now, Mr. Foley tells you we are not even sure if Freund stabbed Walker. That's ridiculous."

After receiving their instructions from Judge Mounts, the jury deliberated for a total of three hours over two days. They returned a verdict of guilty of murder in the first degree on November 1, 1985.[49] At a subsequent penalty phase, the jury recommended a life sentence by a vote of ten to two.[50] Judge Mounts accepted the recommendation and sentenced Freund to life in prison without the possibility of parole for twenty-five years.

### F.

Still represented by the law firm, Freund appealed his conviction on grounds unrelated to the instant petition. Both the Florida Fourth District Court of Appeal and the Supreme Court of Florida affirmed his conviction.[51] *Freund v. State*, 506 So.2d 437 (Fla. 4th Dist.Ct.App.1987) (per curiam), *aff'd*, 520 So.2d 556 (Fla.1988).

After his direct appeal failed, Freund obtained new counsel to attack his conviction collaterally. Through the same counsel that represents him in the instant appeal,[52] Freund filed a motion on March 29, 1990, to vacate the judgment and sentence, pursuant to Fla. R.Crim. P. 3.850 (the "3.850 motion"). The motion was based in part[53] on the claim that Freund was denied his constitutional

---

49. The verdict does not reveal under which theory (premeditation or felony murder) the jury convicted him.

50. The transcripts of the penalty phase are not included in the record before us.

51. The direct appeal contained two claims: (1) Judge Mounts' jury instruction regarding the State's burden of proving that Freund was sane was erroneous; and (2) the evidence conclusively demonstrated that Freund lacked the ability to form the specific intent required for first-degree

murder. The district court of appeal affirmed without opinion, but certified the jury instruction question to the supreme court as an issue of great public importance. The supreme court analyzed and rejected both claims of error.

52. We refer to these attorneys hereinafter as "Freund's counsel."

53. The motion also contained a claim that the composition of the jury pool violated the Florida Constitution, as interpreted in *Spencer v. State*, 545 So.2d 1352 (Fla.1989).

right to the effective assistance of counsel because of the law firm's conflicts of interest.[54] Judge Mounts denied the motion and a subsequent motion for rehearing without conducting an evidentiary hearing. Freund appealed, and on December 19, 1990, in an unpublished opinion, the Florida Fourth District Court of Appeal reversed and remanded the case for an evidentiary hearing on the ineffective assistance claim.[55]

On remand, Freund's counsel moved to disqualify Judge Mounts on January 7, 1991. During proceedings held on Freund's earlier motion for reconsideration of the denial of his 3.850 motion, Judge Mounts admitted to having "firm, fixed and select feelings and opinions about the credibility of" Trent. Claiming that Trent was "one of the key witnesses in support of [Freund's] claim of conflict of interest," Freund's counsel argued that Judge Mounts' preconceived notions about Trent's credibility should disqualify him.[56] Judge Mounts recused on January 10, 1991, and the case was reassigned to another circuit judge, who held an evidentiary hearing on April 25, 1991.

At the hearing, Freund's counsel developed the law firm's conflicts of interest primarily through the testimony of three witnesses. The first witness was Thomas Dick. In 1983 and 1984, Dick was an auxiliary patrolman for the Riviera Beach Police Department and a friend of Trent. Trent had asked Dick to conduct a background investigation of the woman who filed the 1983 aggravated assault charges against Trent. Although he denied ever conducting an investigation, Dick did obtain the police report in that matter and met with Colton and Trent to discuss the case. At one point in this meeting, Colton told Dick that Trent "better straighten up or he's going to be in

more trouble than he knows what to do with." While he did not refuse to investigate the assault victim, Dick claimed that he kept putting it off and never got around to it.

Moving to the events following the murder, Dick testified that he learned that Trent was a fugitive in the murder investigation and that Freund, represented by Foley, had surrendered. Daniell went to see Dick shortly thereafter. Daniell told Dick that "he was [at Trent's apartment] when whatever happened happened." Dick convinced Daniell to turn himself in to the Palm Beach Police Department, and both men went to the police station. At some point, an officer from the department obtained Dick's permission to record calls made to Dick's residence. The police recorded several conversations between Dick and Trent over the next few days. The tapes of several of the telephone calls were played at the evidentiary hearing.

These conversations revealed that Trent was in contact with Colton following the murder. Trent wanted to hire Dick to do some investigatory work, and he told Dick he would arrange for Colton to pay Dick for the work on a retainer agreement. Trent suggested that Colton had a power of attorney over some of Trent's assets.

After the recorded conversations were played at the hearing, Dick recounted a meeting with Colton following the calls from Trent. At that meeting, Colton told Dick that he did not have a power of attorney over any of Trent's assets. Colton related that he represented the estate of Harriett Trent. He told Dick that she left most of the estate with "the daughter"[57] and that neither he (Colton) nor Trent had access to any assets

---

**54.** Freund's counsel argued in its brief, and throughout the proceedings below, that the conflicts of interest arose not only from the law firm's representation of Trent, but also from its representation of Mills and Daniell.

**55.** The court affirmed Judge Mounts' ruling on the *Spencer* claim. As to the conflicts of interest claim, the court held that "the trial court erred in rejecting [Freund's] claim ... without either attaching portions of the record refuting such claim or conducting an evidentiary hearing thereon."

**56.** A copy of Trent's pretrial motion to disqualify Judge Mounts, *see supra* note 35, was attached to and incorporated in Freund's motion. When Judge Mounts admitted to having preconceived notions about Trent's credibility, he also stated, "As you know, [Trent] endeavored to recuse me and I probably should have recused myself because that is more of the law today."

**57.** It is unclear whether Colton was referring to Trent's daughter or a sister of Trent.

of the estate. During these conversations, Dick testified that he spoke with Colton as if Colton was Trent's attorney and that he had no doubt that Colton was Trent's attorney.

Later in the hearing, Colton testified that he did in fact speak with Dick following the murder while Trent was a fugitive. Colton asserted that he had no ability to pay any money on Trent's behalf, that the only power of attorney he possessed relating to Trent was one from Trent to Trent's spouse, and that he never told Dick that he was Trent's attorney. Colton also testified that he "suggest[ed] strenuously" that Dick not get involved with Trent and that, if Trent called Dick again, Dick should try to talk him into surrendering. Colton admitted that Trent had called him after the murder seeking advice. He denied giving Trent any advice and testified that he told Trent that he did not represent Trent and Trent's "only alternative" was to surrender to the police.

Freund's counsel eventually shifted the focus from Trent's contact with Colton after the murder to the scope of Trent's relationship with the law firm prior to the murder. Duncan and Colton both testified as to the nature and extent of that relationship. They discussed the law firm's prior legal representation of Trent, focusing on the drug possession and assault charges. Colton emphasized that new counsel was substituted for the law firm in May 1984 and asserted that Trent sought no further legal advice from the law firm after that date. Colton also admitted that the law firm had represented Daniell on a traffic offense and had "consulted" with Mills on her cocaine charge. He insisted that the meeting with Mills was brief and that after he quoted her a fee, he never saw her again in an official capacity.

Duncan and Colton also testified about Trent's allegations made at the pretrial hearing on his severance motion. Duncan stated that he was appalled at the allegations and that the law firm's general reaction to the allegations was one of anger. Colton flatly denied the allegations. Duncan testified that shortly after the severance hearing, he filed the Motion to Disclose Confidential Informant, which suggested that the law firm might try to prove that Trent, and not Freund, actually killed Walker. He acknowledged that this motion was not consistent with the insanity defense, admitting that it would be "inconsistent to go to trial and say to a jury, listen, he didn't do it but if you don't buy that, then, he was insane."

Freund's counsel moved the questioning from this motion to the lack of evidence implicating Freund. Duncan admitted that all physical evidence pointed to Trent, who owned the guns, handcuffs, baseball bat, and the steamer trunk in which Walker's body was found at House of Draperies, which was also owned by Trent. Duncan further admitted that no physical evidence pointed to Freund and the only testimony directly implicating Freund was Angelilli's uncorroborated statement that she saw Freund making stabbing motions. He conceded that no magnesium sulfate, the drug with which Freund allegedly injected Walker, was found in Walker's body at the autopsy, that none of Walker's blood was found on Freund or in his house, and that the State never found Freund's bloody shirt or the black doctor's bag he allegedly brought to Trent's apartment.

Freund's counsel led Duncan to agree that the three witnesses had credibility problems: Mills was "a prostitute drug addict who was a confidential informant along with John Trent"; Angelilli was "a sixteen-year-old pregnant prostitute also high on cocaine at the time of these events; when she testified at the trial she came pregnant to the witness stand";[58] Judge Mounts had denied bond because Angelilli had been threatened by Trent; and Daniell, who was often referred to as "killer" by Trent, had "once vowed 'I ain't goin' back to prison for nobody.' " When asked if all these facts were consistent with an insanity defense, Duncan suggested that he did not think he could have effectively impeached the witnesses because he had attended Trent's trial and seen that Trent's

---

**58.** This is the only suggestion in the record that Angelilli may have been pregnant at the time of the murder. The record clearly indicates that she was pregnant at the time of trial, when she was eighteen years old.

lawyers were unable to get the witnesses "to back off what they claim they saw."

Duncan went on to describe the insanity defense and testified that he believed that the defense was well supported by the facts of the case, particularly the battery of psychiatric tests conducted after Freund's suicide attempt. He testified that in October 1985, after Trent pled guilty to second-degree murder and received a seventeen-year prison sentence, the prosecutor offered the same deal to Freund. Duncan and Foley discussed the offer with Freund and his parents. The attorneys told Freund the insanity defense was successful thirty percent of the time, and Freund rejected the offer. The prosecutor from Freund's trial also briefly testified at the hearing. He recounted receiving a letter from Foley on October 3, 1985, in which Foley indicated that the law firm believed it had "a unique, valid insanity defense and . . . a chance at getting a manslaughter jury verdict."

Duncan disagreed with Freund's counsel's suggestion that the law firm did not seek to shift the blame for the murder to Trent. He argued that while the defense necessarily implied that Freund killed Walker, the insanity theory was that Freund's mental condition rendered him a "robot" and that Trent intentionally took advantage of Freund's condition. Duncan asserted that the theory of the defense was that Trent made Freund commit the murder.

When asked if Foley's statement during closing argument that Trent might have committed the murder hurt Freund's insanity defense, Duncan admitted that he was shocked when Foley made the statement and that the statement hindered the defense. Duncan testified that he later asked Foley why he made the statement. Foley answered that he did it to "appease" Freund's mother.

Duncan's testimony also focused on the extent of Freund's knowledge of the law firm's prior representation of Trent. On cross-examination by the State, Duncan stated that Freund had never expressed dissatisfaction with the law firm's performance. He insisted that early in the law firm's representation of Freund, he had advised Freund, though only in "general terms," that the law firm had represented Trent in the past. Following Trent's allegations about the law firm at the severance hearing,[59] Duncan testified that he spoke to Freund alone to be sure Freund still wanted the law firm representing him. Duncan admitted that Judge Mounts never questioned Freund about a potential conflict of interest.

The hearing ended with the testimony of an expert in criminal defense law who opined that the law firm's representation of Freund fell below the constitutional standard of effective representation. After the hearing, Freund's counsel and the State both submitted memoranda to the court on the Rule 3.850 motion. Freund's counsel argued that the law firm had labored under significant conflicts of interest and that these conflicts hindered its representation of Freund. The State argued that there was never any "actual conflict of interest." It relied on the Bar opinion and asserted that by severing the trials, Judge Mounts "eliminated the possibility that Foley and Duncan would ever face the possibility of cross-examining former client, John Trent." It argued that even if there were a conflict, Freund affirmatively waived the conflict during his discussion with Duncan following the severance hearing.

In a brief order, the court denied Freund's Rule 3.850 motion. In less than three paragraphs of analysis, the court found that "no conflict existed at any time." Specifically, the court found that the law firm did not represent Trent and Freund at the same time. The opinion contained no analysis of whether the law firm's prior representation of Trent affected its subsequent representation of Freund other than to note that "Mr. Foley's prior representation of Mr. Trent was in matters unrelated to this case." The order concluded that "there was no substantial deficiency in the representation of the

---

59. The record before us does not indicate whether Judge Mounts conducted a hearing on Freund's two motions to sever. Therefore, when we refer to "the severance hearing," we are referring to the hearing on Trent's motion to sever conducted the day jury selection for the joint trial was to begin.

Defendant by which he was prejudiced." The court denied Freund's subsequent motion for rehearing without comment. The Florida Fourth District Court of Appeal affirmed without opinion, and the Supreme Court of Florida declined to exercise its appellate jurisdiction.

Freund filed the instant petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254 (1996), on April 16, 1993, in the United States District Court for the Southern District of Florida. Freund's counsel argued that Freund was denied the effective assistance of counsel because of the law firm's conflicts of interest. The petition alleged that the law firm was ineffective for failing to argue that Trent, not Freund, committed the murder. It also alleged that the law firm's presentation of the insanity defense was deficient, especially in light of Foley's statement at closing argument. The State's response argued first that Freund had failed to exhaust his state remedies and his petition should thus be denied. It further argued that Freund had failed to establish that his defense was prejudiced by any conflict of interest.

A magistrate judge reviewed the record and issued a report and recommendation. The magistrate first found that Freund adequately had exhausted his available state remedies. Addressing Freund's ineffective assistance claim, he found that the record supported the state court's finding that the law firm did not represent Trent and Freund at the same time. He went on to find that the law firm's prior representation of Trent was not substantially related to its subsequent representation of Freund. He also found that Freund failed to point to record evidence demonstrating that the law firm had learned confidential information during its representation of Trent that was relevant to its representation of Freund. Moreover, the magistrate judge found that the law firm's decision to adopt the insanity defense did not reveal a conflict because the alternative defense (i.e., shifting the blame to Trent) was "not realistic in view of the uncontroverted testimony of the eyewitnesses." For all these reasons, the magistrate judge recommended that Freund's petition be denied.

On November 1, 1993, the district court denied Freund's petition, accepting the magistrate judge's recommendation and adopting the reasoning in his report. Freund's counsel filed a notice of appeal on November 16, 1993, and the district court granted a certificate of probable cause to appeal on January 25, 1994. In the instant appeal, Freund's counsel renews the claim that Freund was denied the effective assistance of counsel because the law firm was burdened with significant conflicts of interest. Oral argument was held on April 28, 1995.[60] We agree with the

---

60. We are cognizant of the significant amount of time that has passed since this appeal was placed on our docket. On January 31, 1997, Freund's counsel filed with this court a Motion to Confirm Status of Case and/or for Ruling ("motion for ruling"). The motion notes, "The questions from the bench [at oral argument] suggested that the appellant had presented compelling grounds for reversal. Yet, no decision has been rendered. The appellant is incarcerated awaiting the outcome of this appeal."

In light of both the time it has taken for us to issue this opinion and Freund's motion for ruling, we feel compelled to offer an explanation. While the legal arguments made by Freund's counsel both in the briefs and at oral argument are thorough and persuasive, the explication of the facts of the case in the appellant's brief is of little help. The record in this case includes two boxes of transcripts from Freund's trial and other relevant proceedings. Nonetheless, as we have indicated *supra* there is much relevant information not to be found in the record.

As the State points out in its answer brief, Freund's brief contains few helpful citations to the record below. Rather, the few citations provided are to various exhibits appended to Freund's habeas petition; moreover, these citations rarely contain page numbers. This practice violates our rules of procedure. *See* 11th Cir. R. 28–2(i) ("[E]very assertion regarding matter in the record shall be supported by a reference to the volume, document number and page number *of the original record* where the matter is to be found." (emphasis added)); 11th Cir. R.30–1 (opting to allow appeals on the record, thus relieving appellant's counsel of burden of complying with Fed. R.App. P. 30 requirement of preparing appendix to brief).

As a result, our usual independent review of the record has become a near monumental task. As we have indicated, the resolution of this case is heavily dependent on the facts. Having to sort through and digest thousands of pages of record with little help from appellant's counsel simply takes time. In light of the enormous number of frivolous and often intentionally misleading claims placed on our docket each year, we simply cannot rely on an appellant's uncited assertions of what facts the record discloses.

arguments presented by Freund's counsel, and accordingly we vacate the district court's order denying Freund the writ of habeas corpus and remand with the instruction that the district court issue the writ instanter.

## II.

■ A claim that a defendant has been denied the effective assistance of counsel because his attorney labored under a significant conflict of interest presents mixed questions of fact and law. *Buenoano v. Singletary*, 74 F.3d 1078, 1083 (11th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 117 S.Ct. 520, 136 L.Ed.2d 408 (1996). We defer to the district

At any rate, the panel's review of the record is now complete and its ruling announced. Accordingly, Freund's motion for ruling is DENIED as moot.

**61.** Throughout the proceedings below the parties have disputed whether the law firm represented Trent and Freund at the same time. Although the question of whether an attorney "represents" a client at a given time is also a mixed question of fact and law, their dispute seems to boil down to whether Trent sought and received legal advice from Colton after the murder—a question of fact. This question essentially turns on a matter of credibility: Colton swore that Trent had not sought or received legal advice after the murder, while Trent, at the severance hearing, attested to the contrary.

After the evidentiary hearing in the 3.850 proceedings, the circuit court explicitly found that there was no simultaneous representation at any time. Because we determine that Freund was denied the effective assistance of counsel regardless of whether the law firm's representation of Trent ended before it began representing Freund, we may avoid the delicate task of reviewing, in a federal habeas proceeding, a state court's factual findings. *See* 28 U.S.C. § 2254(d) (1996) (state court findings of fact made after evidentiary hearing are presumed correct). For the purposes of this opinion, we assume that the law firm terminated its representation of Trent before undertaking Freund's defense.

**62.** In addition to arguing that the law firm's representation violated his constitutional right to effective assistance of counsel, Freund also urges us to vacate his sentence because of trial court error. He contends that Judge Mounts was clearly aware of the law firm's conflicts early in the proceedings. Freund claims as error Judge Mounts' failure to conduct a judicial inquiry to determine whether these conflicts were likely to hamper the law firm's ability to represent Freund.

In support of this theory, Freund points to *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and *Wood v. Geor-*

court's findings of fact unless clearly erroneous, but the question of whether the facts of the case resulted in a violation of the Constitution is a purely legal question that we review *de novo*. *Id.*

■ Fortunately, because the parties have not disputed the underlying facts to any material degree,[61] we have no need to review factual findings for clear error. We therefore devote the remainder of the opinion to the purely legal question of whether the law firm's representation of Freund fell below the level of effective assistance mandated by the United States Constitution.[62]

*gia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). In *Holloway*, the Supreme Court held that the trial court's failure to conduct an inquiry, despite representations made in pretrial proceedings alerting the court to a potential conflict, deprived the defendant of the right to effective assistance of counsel. 435 U.S. at 484, 98 S.Ct. at 1178–79. Similarly in *Wood*, the Court reversed a conviction because the trial court failed to inquire into defense counsel's potential conflict of interest even though the court "should have been aware of the problem." 450 U.S. at 272–73, 101 S.Ct. at 1104; *see also Lee v. State*, 690 So.2d 664, 667 (Fla. 1st Dist.Ct.App.1997) ("When defense counsel makes a pretrial disclosure of a possible conflict of interest with the defendant, the trial court must either conduct an inquiry to determine whether the asserted conflict of interest will impair the defendant's right to the effective assistance of counsel or appoint separate counsel.").

Although these cases and their progeny speak in terms of the Sixth Amendment right to effective assistance of counsel, they involve claims of procedural, pretrial errors by the trial court, as opposed to a more substantive Sixth Amendment claim that trial counsel was ineffective. *Cf. Stano v. Dugger*, 921 F.2d 1125, 1158–59 (11th Cir. 1991) (en banc) (Tjoflat, J., dissenting) (distinguishing between trial court error and pure effective-assistance-of-counsel claim), *cert. denied*, 502 U.S. 835, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991); *James v. Singletary*, 957 F.2d 1562, 1570–71 (11th Cir.1992) (providing similar analysis for claims that the defendant was incompetent at the time of trial). Analysis of the former kind of claim requires us to determine and evaluate the facts that the trial court knew, or reasonably should have known, before the trial commenced, then determine whether the trial court should have predicted that these facts might prejudice Freund at trial, and then second-guess the trial court's implicit decision not to conduct *sua sponte* a thorough inquiry. Analysis of the latter kind of claim, on the other hand, focuses on what actually happened: was counsel's representation unconstitutionally ineffective?

### III.

▆ The Sixth Amendment guarantees that in all criminal prosecutions, the accused shall have the "Assistance of Counsel for his Defense." U.S. Const. amend. VI. The United States Supreme Court has interpreted this right to include the right to *effective* assistance of counsel. *See e.g., McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). Whether it is appointed by the court or privately retained, defense counsel "can . . . deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.' " *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980)). A sufficiently significant conflict of interest prevents an attorney from providing the effective assistance contemplated by the Sixth Amendment.[63] *See Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *Duncan v. Alabama,* 881 F.2d 1013, 1016 (11th Cir.1989).

▆ In order to prevail on an ineffective-assistance-of-counsel claim based on a conflict of interest, a habeas petitioner must demonstrate that an "actual conflict of interest adversely affected his lawyer's performance." [64] *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718. An "actual conflict" of interest occurs when an attorney has "inconsistent interests." *See Smith v. White,* 815 F.2d 1401, 1405 (11th Cir.), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). To prove that the conflict "adversely affected" his representation, the "petitioner need not show that the result of the trial would have been different without the conflict of interest, only that the conflict had *some* adverse effect on counsel's performance." *McConico v. Alabama,* 919 F.2d 1543, 1548 (11th Cir.1990) (emphasis added).

In the case before us, Freund therefore must demonstrate that the law firm labored under an actual conflict of interest and that this conflict had an identifiable adverse effect on its ability to represent him. In part A, we explore the relationship between the law firm's duties to Freund, on the one hand, and its duties to Trent and Mills and its own self-interest, on the other hand. In part B, we review the law firm's trial strategy. In one sense, these constitute the separate inquiries into "actual conflict" and "adverse effect." This case demonstrates, however, that "actual conflict" and "adverse effect" are bound together. The adverse effect leaves us with no doubt, for instance, that the conflict was very real. Similarly, the inevitability of the conflict leaves us no doubt that an adverse effect was inescapable. Thus, despite the division of part III into subparts, our inquiries into "actual conflict" and "adverse effect" necessarily interrelate.[65] In part C, we con-

Under the facts of this case, we see no need to embark on an analysis of Freund's claim of procedural error. Regardless of whether Judge Mounts knew or should have known of the law firm's conflicts and the potential for prejudice, we have little difficulty concluding, as the analysis that follows shows, that the law firm's conflicts of interest prevented it from representing Freund effectively. In other words, whether or not Judge Mounts erred, Freund's conviction must be vacated because of the conduct of his attorneys. We therefore express no view on Freund's claim of procedural error.

**63.** The Sixth Amendment right to counsel has been made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *See Gideon v. Wainwright,* 372 U.S. 335, 342–43, 83 S.Ct. 792, 795–96, 9 L.Ed.2d 799 (1963).

**64.** In an ordinary ineffective-assistance claim, the petitioner must prove "prejudice"—that is, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The Supreme Court has made clear, however, that prejudice is *presumed* where an actual conflict of interest adversely affected counsel's performance. *Id.* at 692, 104 S.Ct. at 2067.

**65.** Indeed, one frequently employed test used in this circuit to determine whether a particular conflict was actual, as opposed to merely hypothetical, looks directly to whether the conflict had an adverse impact on defense counsel's performance at trial. *See e.g., Barham v. United States,* 724 F.2d 1529, 1532 (11th Cir.) (requiring petitioner to prove actual conflict by "demonstrat[ing] that the attorney made a choice, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other") (quoting *United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.1983)), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984).

While we find that the facts of this case clearly satisfy this test, we prefer to keep our analysis of

clude our opinion with a brief analysis of the State's contention that Freund waived any conflict of interest.

### A.

■ In order to prove that the law firm's performance was hindered by an actual conflict, Freund "must make a factual showing of inconsistent interests." *Buenoano*, 74 F.3d at 1086 n. 6 (quoting *Smith*, 815 F.2d at 1404). To do this, he must "point to specific instances in the record to suggest an actual conflict or impairment of" his interests. *Id.* Freund has satisfied this burden by demonstrating that the record is replete with specific circumstances giving rise to at least three separate sources of conflict: (1) the law firm's prior representation of Trent; (2) the law firm's prior representation of Mills; and (3) the allegations of embarrassing and illegal conduct leveled by Trent against members of the law firm at the pretrial severance hearing.

■ To illustrate why each of these is a source of conflicting interests, we begin by examining the contours of the ethical obligations and duties an attorney owes his or her client.[66] At the time of Freund's trial, members of The Florida Bar were governed by Florida's version of the American Bar Association's 1969 Model Code of Professional Responsibility (the "Florida Code"). *See In re Integration Rule of The Florida Bar*, 235 So.2d 723 (Fla.1970) (adopting Model Code). In 1987, Florida replaced the Florida Code with its own version of the 1983 American Bar Association's Model Rules of Professional Conduct, found in chapter four of the Rules Regulating The Florida Bar (the "Florida Bar Rules"). *See The Florida Bar Re Rules Regulating The Florida Bar*, 494 So.2d 977 (Fla.) (adopting Florida Bar Rules), *corrected by* 507 So:2d 1366 (Fla. 1986). Other jurisdictions have adopted similar versions. Additionally, opinions by state and federal courts interpreting the principles of these codifications of legal ethics have proliferated in the past few decades, although most of the principles date to a much earlier time.[67]

■ An examination of these various sources reveals at least three important duties that an attorney owes his client—a duty to represent a client zealously, a duty of confidentiality, and a duty to exercise independent judgment. Canon seven of the Florida Code recognized an attorney's duty to "represent a client zealously within the bounds of the law." [68] Simply put, an attorney must be loyal to her client and ensure that every professional decision she makes on behalf of the client is in the client's best interest. *See Wilson v. Wainwright*, 474 So.2d 1162, 1164 (Fla.1985) ("[T]he basic requirement of due process in our adversarial legal system is that a defendant be represented in court, at every level, by an advocate who represents his client zealously within the bounds of the law.") An attorney who intentionally prejudices or harms the interests of her client violates this duty. *See* Fla.Code of Professional Responsibility DR 7–101(A)(3); *Wilson*, 474 So.2d at 1164 ("Every attorney in Florida has taken an oath to

---

the nature of the law firm's conflicts separate from our analysis of the impact these conflicts had on Freund's trial.

**66.** To be sure, the violation of a state bar's ethical edict by a criminal defense lawyer does not necessarily work a deprivation of his client's right to the effective assistance of counsel. *See Lightbourne v. Dugger*, 829 F.2d 1012, 1023 n. 12 (11th Cir.1987) (per curiam) ("Of course, what constitutes a conflict of interest as a matter of legal ethics or as a matter of state law and what constitutes a conflict of interest for federal constitutional questions may differ."), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Nevertheless, in this case it is the law of ethics that made the law firm's various duties irreconcilable. Accordingly, we must flesh out

the ethical considerations facing Foley and Duncan during their representation of Freund.

**67.** For instance, one might cite to the New Testament for the proposition that no man can serve two masters, *see* Matthew 6:24 (King James), or to the London Ordinance of 1280, which specifically addressed lawyers with conflicting interests. *See* Charles W. Wolfram, *Modern Legal Ethics*, § 7.1.1, at 312 (practitioner's ed.1986).

**68.** The Florida Bar Rules also explicitly recognize this duty. *See* R. Regulating the Fla. Bar ch. 4, preamble ("As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.").

[represent their clients zealously] and we will not lightly forgive a breach of this professional duty in any case; *in a case involving the death penalty it is the very foundation of justice.*" (emphasis added)). While an attorney should never assert a false or frivolous defense on behalf of a client, a defense attorney may always put the prosecutor to his burden of proving every element of the charged offense, even if the attorney knows her client committed the offense.[69] *See* R. Regulating the Fla. Bar 4–3.1; ABA Center for Professional Responsibility, *Annotated Model Rules of Professional Conduct* 302 (3d ed.1996); *see also United States v. Yelardy*, 567 F.2d 863, 867 (6th Cir.) (Peck, J., dissenting) ("It is not the lawyer's role to determine a client's guilt or innocence, and 'reasonable cause to believe' a client guilty cannot ethically affect a lawyer's representation."), *cert. denied*, 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978).

In addition to representing her client zealously, the attorney must maintain a duty of confidentiality to the client. Canon four of the Florida Code stated, "A lawyer should preserve the confidences and secrets of a client." This obligation "lies at the very foundation of the attorney-client relationship." *Ford v. Piper*, 436 So.2d 305, 307 (Fla. 5th Dist.Ct.App.1983). "Confidences," the Code explained, refer to information protected by the attorney-client privilege, while "secrets" refer to other information gained during the professional relationship which the client had requested be held inviolate or the disclosure of which "would be embarrassing or would be likely to be detrimental to the client." Fla.Code of Professional Responsibility DR 4–101(A). Under the Florida Code, an attorney was generally subject to discipline for revealing a client's confidences or secrets or for using them either to the disadvantage of the client or for the benefit of the attorney or a third person without the client's informed consent.[70] *See* Fla.Code of Professional Responsibility DR 4–101(B); *see also Ford*, 436 So.2d at 307.[71]

The protection that the law of legal ethics affords a client's confidences and secrets is broad. *See Buntrock v. Buntrock*, 419 So.2d 402, 403 (Fla. 4th Dist.Ct.App.1982) (noting that protections are broader than attorney-client evidentiary privilege). The protection "exists without regard to the nature or source of information or the fact that others share the knowledge." Fla.Code of Professional Responsibility EC 4–4. The duty of confidentiality does not end when the representation ends; an attorney must forever preserve the secrets and confidences of her clients, even former clients. Fla.Code of Professional Responsibility EC 4–6; R. Regulating the Fla. Bar 4–1.9(b); *State Farm Mut. Auto. Ins. Co. v. K.A.W., Continental Cas. Co.*, 575 So.2d 630, 632 (Fla.1991).

█ Moreover, the duty of confidentiality places effective limits on an attorney's future employment. Specifically, an attorney can-

---

**69.** For this reason, the fact that Freund may have confessed to committing the crime while consulting with the law firm did not prevent the law firm from pursuing an innocence defense and putting the State to its burden of proof.

**70.** The Code provided two limited exceptions allowing an attorney to reveal a client's (1) confidences or secrets when ordered to by a tribunal after exhausting appellate remedies or (2) intent to commit a crime. Fla.Code of Professional Responsibility DR 4–101(D).

**71.** The Florida Bar Rules have similar provisions. Except under limited circumstances, an attorney cannot "reveal information relating to representation of a client … unless the client consents after full disclosure." R. Regulating the Fla. Bar 4–1.6(a). This rule prevents an attorney from revealing "all information relating to the representation, whatever its source." *See*

R. Regulating the Fla. Bar 4–1.6 cmt. In addition to the prohibition on *revealing* such information, the rules prohibit the *use* of such information to the detriment of the client, unless the client consents after disclosure.

The new rules provide more exceptions than did the Florida Code. An attorney *must* reveal information relating to the representation to the extent necessary to prevent a crime or serious injury to another. R. Regulating the Fla. Bar 4–1.6(b). An attorney *may* reveal such information to the extent she reasonably believes necessary (1) to further the client's interest (unless the client specifically requested the information not be disclosed), (2) to establish or defend a claim between her and the client, (3) to defend herself against a criminal or civil claim based on the client's conduct, (4) to respond to allegations in a proceeding concerning her representation of the client, or (5) to comply with the rules. R. Regulating the Fla. Bar 4–1.6(c).

not ethically accept employment representing a potential client with interests adverse to a former client when the proposed representation involves a matter substantially related to the former representation. *See* R. Regulating the Fla. Bar 4–1.9(a); *United States v. McCutcheon,* 86 F.3d 187, 189 (11th Cir.1996) (per curiam) ("There can be no doubt that [counsel's] prior representation of [the co-defendant] created an ethical conflict that would disqualify him from cross-examining [the co-defendant]."). Courts are always free to disqualify an attorney from representing a litigant if the attorney would be in a position to use information obtained while representing a prior client. *See United States v. Ross,* 33 F.3d 1507, 1523 (11th Cir.1994) ("If the conflict [between the interests of the former client and the new client] could cause the defense attorney improperly to use privileged communications in cross-examination, the disqualification [of the attorney in the new client's case] is appropriate."), *cert. denied,* 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995); *see also Fitzpatrick v. McCormick,* 869 F.2d 1247, 1252 (9th Cir.) ("[P]reservation of a proper attorney-client relationship requires 'a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one ....' " (quoting *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980))), *cert. denied,* 493 U.S. 872, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989).

■ The third important duty the attorney owes her client also places restrictions on her ability to represent future clients. Canon five of the Florida Code recognized an attorney's duty to "exercise independent professional judgment on behalf of a client." To fulfill this ethical duty, the attorney must avoid conflicts of interest. *See Barclay v. Wainwright,* 444 So.2d 956, 958 (Fla.1984). The Florida Code prohibited an attorney from representing a potential client when the attorney's professional judgment "will be or reasonably may be" influenced by her "own financial, business, property, or personal interests," unless the client gave his informed consent. Fla.Code of Professional Responsibility DR 5–101(A). Similarly, an attorney could not accept a new client if that representation would likely "adversely affect" her judgment on behalf of another client, without both clients' informed consent. Fla.Code of Professional Responsibility DR 5–105(A), (C).[72]

This duty is based in part on the attorney's duty to represent her client zealously. If an attorney's own personal interests or the interests of someone else to whom the attorney owes a duty (usually another client) conflict with the interests of a client, she will be restrained in her ability to represent that client zealously. Moreover, when a client's interests conflict with the interests of a former client whom the attorney represented in a related manner, the duty to represent the new client zealously and the duty to maintain the confidences of the former client may become irreconcilable. The attorney very likely obtained information during the prior representation that would be helpful in the current representation. *See Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1027 (5th Cir. Unit B June 1, 1981) ("Whenever an attorney seeks to represent an interest adverse to that of a former client, the possibility arises that the attorney, whether intentionally or inadvertently, will reveal to his present client confidential information entrusted to him during his previous

---

**72.** The Florida Bar Rules provide even more detailed restrictions. An attorney may not undertake representation that will be "directly adverse to the interests of another client," unless the attorney believes her judgment will not be adversely affected and both clients give their informed consent. R. Regulating the Fla. Bar 4–1.7(a). Moreover, the rules prohibit an attorney from representing a client if the exercise of her professional judgment "may be materially limited by" her duties to another client or a third person or by her own personal interests, unless she reasonably believes she can adequately represent the client and the client consents after consultation. R. Regulating the Fla. Bar 4–1.6(b).

The Florida Bar Rules provide a specific rule regarding conflicts of interest involving former clients. This rule provides that an attorney who has represented a former client in a matter must not later "represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." R. Regulating the Fla. Bar 4–1.9(a).

representation."), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). To use this information to the benefit of the new client would violate the attorney's duty of confidentiality owed to the former client. Conversely, to refrain from using this information would violate the attorney's duty to represent the new client zealously.

 In summary, before accepting representation of a new client, an attorney must evaluate her ability to perform at least three duties: she must be able to represent the client zealously and to exercise independent judgment on behalf of the new client, but at the same time, she must be able to maintain her duty of confidentiality owed to her other clients, both current and former.

Now that we have reviewed three of the most important duties an attorney owes her client, we return to the facts of the instant appeal. We begin by examining the law firm's specific obligations to Freund. We then examine the three sources of conflict to which Freund points in the record. We explain why each of these circumstances created actual conflicts of interest hindering the law firm's ability to satisfy its ethical duties to Freund.

When it decided to represent Freund, the law firm assumed the duty to put his interests above all else. Every tactical choice the law firm faced would have to be made based on what was best for Freund. The law firm first had to advise Freund on what theory of defense they should pursue. The facts of the case presented two strong theories of defense. First, the lack of physical evidence implicating Freund and the severe credibility problems of the witnesses to the crime, as well as Trent's past history and the mountain of evidence implicating Trent, all suggested that Freund simply could deny the allegations and put the State to its burden of proving that he killed Walker. Second, Freund's suicide attempt, the resulting, documented brain damage, and the personal observations by Freund's friends and associates all suggested that Freund could concede that he killed Walker, but seek to avoid criminal liability with an insanity defense. The law firm's duty to Freund was to advise him of which strategy to pursue, guided by one consideration alone—which strategy was in Freund's best interest.

 Although it was forbidden by the law of ethics from considering other interests, the decision the law firm would make would have serious implications with regard to the law firm's interests arising from at least three other sources. First and foremost was the law firm's prior representation of Trent. Although it had terminated its representation of Trent by the time it accepted Freund as a client,[73] the law firm[74] still owed him the duty of confidentiality. The question thus becomes: Would either of the possible defenses of Freund conflict with this duty to Trent?

73. As we mentioned *supra* note 61, although Freund has alleged that the law firm's representation of Trent continued until after it began representing him, we assume that it did not. We recognize that "the absence of simultaneous representation is a significant factor; generally, it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so," *White,* 815 F.2d at 1405. Nevertheless, the facts of this case leave little doubt that the law firm's continuing duties to Trent actually conflicted with its duty to Freund.

74. We note that it makes no difference which attorneys in the law firm represented Trent and which ones represented Freund. When attorneys join together to form a law practice, each generally assumes the responsibilities of the others. Because members of a law firm generally have access to the files of all the firm's clients and because they often discuss their cases with each other, any one member's knowledge of confidential information is generally imputed to the other members. *See* Fla.Code of Professional Responsibility DR 5–105(D) ("If a lawyer is required to decline employment or to withdraw from employment under [the conflict-of-interest rules], no partner or associate of his or his firm may accept or continue such representation."); *Sears, Roebuck & Co. v. Stansbury,* 374 So.2d 1051, 1053 (Fla. 5th Dist.Ct.App.1979). For this reason, "if one attorney in a firm has an actual conflict of interest, we impute that conflict to all the attorneys in the firm." *Ross,* 33 F.3d at 1523; *see also* R. Regulating the Fla. Bar 4–1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any 1 of them practicing alone would be prohibited from doing so by [the rules of confidentiality and conflict of interest].").

■ We examine the two defenses in turn. An actual conflict between the interests of a former client and a new client arises if the two clients have inconsistent interests and the representations are substantially related. *See Fitzpatrick*, 869 F.2d at 1252; *cf. Ross*, 33 F.3d at 1523 (applying this standard in reviewing trial court's decision to disqualify counsel). Had the law firm opted to defend Freund by putting the State to its burden of proof, Trent and Freund would clearly have had inconsistent interests. Under the facts of this case, a denial of factual guilt by Freund could mean but one thing: Trent killed Walker. In light of all the evidence implicating Trent, the law firm could have attempted to provide reasonable doubt as to Freund's guilt by arguing that Trent committed the killing. When a new client seeks to shift the blame for the charged crime to a former client, the two clients clearly have inconsistent interests. *See Burden*, 24 F.3d at 1305 (finding actual conflict where one client blamed crime on another); *Fitzpatrick*, 869 F.2d at 1252 ("The potential for conflicting interests is particularly acute when, as here, the two clients are, or were, codefendants who allege different levels of culpability in the crime.").

■ Not only would Trent and Freund have had inconsistent interests under a blame-shifting defense, but the law firm's defense of Freund was substantially related to its prior representation of Trent. Two representations are substantially related, for purposes of showing actual conflict, if specific facts related to the first representation would be both material and useful in the second representation.[75] If so, confidentiality concerns would limit counsel's ability to use information beneficial to the new client.

The law firm's representation of Trent on charges of possession of diazepam and methaqualone and of aggravated assault clearly involved information that would be pertinent to a blame-shifting defense. The autopsy of Walker indicated that he died with diazepam in his bloodstream, and the testimony of all three witnesses established that Walker was injected with this drug shortly before his death. Had the law firm pursued a blame-shifting defense, any information it learned in representing Trent on the possession charge would have been useful to prove that Trent had injected Walker with diazepam. In a similar vein, facts that it learned in relation to the aggravated assault charge would be useful to an attempt to prove that Trent committed the violent killing.[76]

In addition to the law firm's representation of Trent on these specific charges, Trent testified at the pretrial severance hearing that during the course of the law firm's long-term representation of him, he confided that he used drugs and committed other crimes. Nothing in the record suggests that this was not true. This information would also have been of significant assistance to the law firm in preparing and presenting a defense shifting the blame for the murder to Trent. Moreover, during the course of representing Trent, members of the law firm apparently met with Trent at his Palm Beach Hotel, the scene of the murder. While there, they saw his assortment of "sexual devices," including handcuffs, possibly the very handcuffs used on Walker.[77] Clearly, this was pertinent in-

---

75. Whether the law firm actually learned of the facts during the first representation is immaterial. *See Duncan*, 646 F.2d at 1028 (holding that, for disqualification purposes, once court determines that representations were substantially related, it must "irrebuttably presume that relevant confidential information was disclosed during the former period of representation"); *see also State Farm Mut. Auto. Ins. Co.*, 575 So.2d at 634 ("The presumption [that confidences were disclosed] acknowledges the difficulty of proving that confidential information useful to the attorney's current client was given to the attorney. It also protects the [former] client by not requiring disclosure of confidences previously given to the attorney.").

76. That evidence of prior bad acts is generally not admissible to prove propensity or character, *see* Fla. Evid.Code § 90.404(2), does not alter our analysis. First, such evidence can be used for several other purposes, including opportunity, intent, knowledge, or identity. § 90.404(2)(a). Second, even if the law firm did not gain any information that it could directly introduce as evidence, it surely gained information that could have assisted it in effectively deposing Trent or cross-examining him at trial.

77. It is unclear whether Colton's blanket denial of Trent's allegations was intended to deny this particular allegation. Because the State did not elicit more detailed testimony from Colton, or

formation that would be useful in defense of Freund.[78] Thus, the law firm's prior representation of Trent clearly created an actual conflict of interest burdening any defense that shifted the blame to Trent.

A pure insanity defense, on the other hand, posed much less of a threat of conflict. To the extent that the defense admitted that Freund committed the murder, it was perfectly consistent with Trent's interests—it might have exculpated him of a capital crime.[79] As the defense actually developed, however, it did contradict Trent's interests.[80] Instead of merely arguing that Freund lacked the ability to understand the consequences of his actions, the defense suggested that Trent intentionally made Freund murder Walker: he made Freund inject Walker

with a drug he had recently been charged with possessing, and he made Freund stab Walker to death. Again, the law firm's earlier representation of Trent was substantially related to its defense of Freund. Thus, even the insanity defense, as litigated, posed an actual conflict of interest, though the conflict was less concrete than under a pure blame-shifting defense. Freund has demonstrated that the law firm's prior representation of Trent created an actual conflict of interest of the most blatant sort.[81]

 Though less severe, an actual conflict was also created by the law firm's prior representation of Mills.[82] Mills was a State witness, and the law firm understood from the beginning that it would have to cross-examine her at some point. "An attor-

---

**78.** Indeed, a person who could recount the layout of Trent's apartment and confirm that he kept a pair of handcuffs in his apartment might have been a useful witness in Freund's defense. Of course, it probably would have been unethical for members of the law firm to appear as witnesses in a trial where they represented the defendant. *See* Fla.Code of Professional Responsibility DR 5-101(B); R. Regulating the Fla. Bar 4-3.7.

**79.** As we discuss *supra* note 27, Trent still could have been convicted of first-degree murder, but the chances he would receive the death penalty were significantly less if Freund was found to have committed the murder.

**80.** We note that, in contending that the law firm was not afraid to go against Trent's interests, the State points out that Freund's insanity defense was in fact a blame-shifting defense. Although this defense would be less inconsistent with Trent's interests, this argument only makes the actual conflict more clear.

**81.** Throughout these proceedings, though not in its reply brief, the State has pointed to the Bar opinion as evidence that there was no conflict of interest. Although the State and the law firm have described this letter as establishing that there was no conflict in representing Freund, a quick review of the letter belies this claim. The letter warned the law firm that if, during its representation of Trent, it could have acquired information "which could be used to [Trent's] detriment," then the law of ethics "would prohibit the proposed representation even if a sever-

any testimony from Foley, we presume that the denial was aimed only at Trent's allegations of illegal conduct.

ance of the former and present clients' cases were granted."

Even if the opinion did state that there was no conflict, the State's reliance on the letter would be unavailing. First, the writer of the letter, an individual staff attorney, did not have before him the relevant facts. Duncan's letter requesting the opinion falsely stated, "Clearly, the prior representations of [Trent] are in no way connected to the instant homicide." Thus, the opinion was not based on the actual facts involved. Moreover, informal opinions written by lone staff attorneys at a state bar association office do not provide a defense to a claim of serious constitutional error. Even if all involved were reasonable in relying on their interpretation of the opinion, the fact remains that the law firm was burdened by an actual conflict of interest as a result of its prior representation of Trent.

**82.** The State argues in its brief that the law firm never represented Mills. This contention is belied by the record. It is undisputed that Mills met with Colton to seek legal advice on her cocaine trafficking charges and that during this consultation Mills discussed the facts and circumstances surrounding the charges. These facts are sufficient to establish an attorney-client relationship. *See Westinghouse Elec. Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978) ("The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result."); *Green v. Montgomery County*, 784 F.Supp. 841, 845–46 (M.D.Ala. 1992) (noting that test for attorney-client relationship depends on reasonable expectations of alleged client). Whether Mills ever paid a fee to Colton is not determinative. *See The Florida Bar v. King*, 664 So.2d 925, 927 (Fla.1995) ("A fee is not necessary to form an attorney-client relationship.").

ney who cross-examines a·former client inherently encounters divided loyalty." *Lightbourne,* 829 F.2d at 1023. While "mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish 'inconsistent interests,' " *Smith,* 815 F.2d at 1405, Freund has more. Where the petitioner proves both (1) that the former client/witness was material to the prosecution and (2) that the prior representation likely provided the law firm with information that could be used to impeach the former client/witness, he has established actual conflict. *See Porter v. Wainwright,* 805 F.2d 930, 940 (11th Cir.1986) (focusing on fact that former client/witness was "one of the prosecution's star witnesses"), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987); *Smith,* 815 F.2d at 1405–06 (rejecting habeas claim where petitioner could not show that "either (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case"). While this may not be the only way to show actual conflict, it is certainly sufficient.

■ There can be no doubt that Mills was a key witness for the prosecution. She was an eye witness to almost all the events of the night of the murder, except for the murder itself. Freund has also satisfied the second prong. When she consulted with the

law firm about her cocaine trafficking charges, the law firm very likely obtained information that it could use to impeach her testimony on cross-examination.[83] From this representation, the law firm likely learned—in fact the record strongly suggests that it did learn—that she frequently used cocaine. This information was very relevant to her credibility, particularly in light of her admission that she was high on cocaine the night of the murder.

Moreover, the law firm certainly learned during the consultation that she was a close friend of Trent and that Trent was helping her avoid jail time. These facts could have been used to prove that she was biased in favor of·Trent and thus likely to falsely accuse Freund of the murder. While cross-examining her about her trafficking charges would have aided Freund's defense, it would have violated the law firm's duty of confidentiality to Mills.[84] In short, the law firm's prior representation of Mills established an actual conflict of interest restraining its ability to effectively represent Freund.[85] *See Porter,* 805 F.2d at 939 (finding actual conflict where counsel "was forced to choose between discrediting his former client through information learned in confidence, or foregoing vigorous cross-examination in an attempt to preserve [the] attorney-client privilege").

■ The final source of conflict arose at the severance hearing. In open court and under oath, Trent alleged that Foley and

---

83. We are mindful of Mills' statement at her deposition that she had already disclosed to Trent's counsel (in Duncan's presence) any information she conveyed to the law firm during the consultation. This revelation does not affect our analysis for two reasons. First, the duty of confidentiality "applies even though the same information is discoverable from other sources." *Buntrock,* 419 So.2d at 403. Second, because she withheld her consent for the law firm to disclose her confidences—in fact she affirmatively challenged their right to do so—there is strong reason to disbelieve her statement.

84. In fact, the law firm did question her extensively about how she met Trent and how he offered to help her with her defense. *See supra* note 44. In focusing on her concerns over the mandatory minimum sentence and large fine she faced if convicted of trafficking, Duncan unethi-

cally questioned her about matters directly related to the law firm's prior representation of her. Tellingly, he stopped short of asking her about her consultation with his law firm.

85. Again, the State points to the Bar opinion as evidence that there was no conflict. Aside from the other reasons to doubt the persuasiveness of this opinion discussed *supra* note 81, the opinion once again warned the law firm of the potential conflict. It warned that examining Mills about the murder would be unethical if the murder occurred soon after the consultation (it did) or if the murder at all related to information obtained in the prior representation (it did). Even more damning to the State's position is the final warning in the opinion that if the law firm's ability to question Mills were constrained by its duty of confidentiality, then the law firm might be ethically prohibited from representing Freund.

Colton had engaged in embarrassing and illegal conduct. Importantly, these statements were made in front of a large media presence, ensuring that inflammatory allegations would make the headlines and nightly news. After these accusations, the members of the law firm suddenly had something new to worry about—their own interests. Trent demonstrated that he so opposed his former law firm's representation of Freund that he would not hesitate to attack the law firm in front of the world.

Whether or not the allegations were true (Colton denied them twice, and Foley declined to testify), the law firm developed a strong incentive to avoid using a defense implicating Trent. Trent made it clear that he would respond to any attempt by the law firm to harm his interests. Even if untrue, the allegations could lead to serious embarrassment and harm the law firm's reputation in the eyes of the community, not to mention potential future clients. If the allegations were supported by evidence, they could have led to discipline by The Florida Bar or criminal prosecution by the State. Thus, the law firm had a strong incentive not to further antagonize their former client.[86]

■■■ This incentive not to antagonize Trent was inconsistent, however, with Freund's potential defense of shifting the blame to Trent. If the law firm opted for this defense, it surely should have expected that Trent would have responded by renewing his accusations. When an attorney's own personal interests would be compromised by

pursuing a particular defense theory, actual conflict has been established. *See United States v. McLain*, 823 F.2d 1457, 1463–64 (11th Cir.1987) (finding actual conflict where defense counsel was under criminal investigation and had incentive to delay defendant's trial and avoid plea bargaining in hopes of delaying indictment against himself); *Fulton*, 5 F.3d at 609 ("A situation in which the attorney's own interests diverge from those of the client presents the same core problem presented in the multiple representation cases: the attorney's fealty to the client is compromised."). The law firm's representation of Freund was thus burdened by an actual conflict of interest caused by Trent's allegations at the severance hearing.

Freund has clearly established no less than three actual conflicts of interest burdening his representation by the law firm. While each conflict very well might have been sufficient under *Cuyler*, there can be no question when all three are viewed together. We thus turn to the final inquiry: did these conflicts "adversely affect" the law firm's representation of Freund?

### B.

■■■ To prove adverse effect, a habeas petitioner must satisfy three elements. First, he must point to "some plausible alternative defense strategy or tactic [that] might have been pursued." *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir.1985); *see also Porter*, 805 F.2d at 939–40. Second, he

---

**86.** The Second Circuit has noted another conflict facing a law firm that has been accused of criminal conduct.

> [E]ven if the attorney is demonstrably innocent and the government witness's allegations are plainly false, the defense is impaired because vital cross-examination becomes unavailable to the defendant. Ordinarily, a witness's blatantly false allegations provide a rich source for cross-examination designed to cast doubt on the witness's credibility; but, when the allegations are against the defendant's attorney, this source cannot be tapped. An attorney cannot act both as advocate for his client and a witness on his client's behalf. And, in questioning a witness concerning allegations against the attorney, the attorney effectively becomes an unsworn witness.

*United States v. Fulton*, 5 F.3d 605, 610 (2d Cir.1993) (citations omitted).

*Fulton* involved an accusation by a witness for the prosecution. Although Trent did not testify at Freund's trial, he certainly could have. First, at the severance hearing he gave every indication that he would testify in his own defense, thus waiving his Fifth Amendment right to remain silent. Second, by the time of Freund's trial, Trent had pleaded guilty to second-degree murder. Thus, he could not claim the Fifth Amendment privilege at Freund's trial because he had already been convicted. Whether or not he should have been called as a witness, the law firm certainly had a duty to question him about the events of the night of the murder. The same concerns outlined in *Fulton* would apply regardless of whether the questioning occurred at trial or in a deposition.

must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, *see Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067, the petitioner "need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used," rather he only need prove that the alternative "possessed sufficient substance to be a viable alternative." *Fahey*, 769 F.2d at 836. Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* Applying this test to each of the three actual conflicts reveals that each one had an adverse effect on the law firm's performance.

The law firm chose to pursue an insanity defense. By making this choice, the law firm decided to forgo the alternative defense strategy of denying guilt by blaming the murder on Trent. Such a strategy would have been more than reasonable under the facts of this case. The State had a very weak evidentiary case against Freund. No physical evidence inculpated Freund. The only evidence that Freund was present at the scene of the murder was the testimony of Mills, Angelilli, and Daniell, all of whom suffered significant credibility problems.

All three were under the influence of cocaine at the time of the murder. They were all clearly more loyal to Trent; they admitted that they did everything he told them to do. Angelilli had testified that she was "interested in" Trent and was attracted to his lifestyle. Moreover, all feared retribution from Trent if they implicated him: he threat-

ened to kill Mills and Angelilli, as well as Daniell's family. Thus, each had an incentive to exculpate Trent, at Freund's expense.

Furthermore, at the time they testified, none had been charged with a crime stemming from their actions the week of the murder. They all admitted to using illegal drugs and helping Trent subdue Walker; Daniell admitted to injecting Walker several times; and Mills admitted to helping hide Walker's corpse.[87] Thus, the law firm could have argued that all three witnesses were testifying in the hopes of avoiding liability for their own roles.[88] As a result, they had an incentive to slant their testimony to incriminate Freund.

The only witness claiming to have seen Freund stab Walker was a pregnant teenager, topless dancer, and long-time drug user. She was only sixteen at the time of the offense and admitted to having snorted cocaine for at least seven hours, perhaps much longer. Moreover, she admitted that she could not actually see the knife stabbing Walker. Her view of Walker's body was blocked by the couch. She only saw Freund make stabbing motions toward Walker's body. Indeed, after subduing Walker, Trent had made similar stabbing motions toward Walker on several occasions throughout the evening.

Even if the State could prove that Freund stabbed Walker, it still had to prove specific intent to get a conviction of first-degree murder. As noted *supra*, Florida defines first-degree murder as a killing that is either premeditated or committed in the course of committing certain felonies, including kidnapping. Both theories require specific intent.[89]

---

87. We suggest a sampling of criminal charges that could have been based on this conduct *supra* note 16.

88. Moreover, Mills demonstrated by her testimony that she had contemplated, at Trent's suggestion, working with the police to set up someone who had crossed Trent and testify against that person for the prosecution.

89. Under Florida law,

[p]remeditation is more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a

moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable results of that act.

*Wilson v. State*, 493 So.2d 1019, 1021 (Fla.1986).

Kidnapping is defined under Florida law as "forcibly, secretly, or by threat confining, abducting, or imprisoning another person against his will and without lawful authority, with intent to" commit one of four enumerated acts. Fla. Stat. ch. 787.01(1) (1984 Supp.). The only enumerated act relevant to this case is to "[i]nflict bodily harm upon or to terrorize the victim or another person." Fla. Stat. ch. 787.01(1)(3). The State

There is little evidence that Freund possessed the specific intent to either kill or to kidnap.[90] When Trent called Freund, he only told him that he wanted Walker sedated, not killed. When Freund arrived at Trent's apartment, Trent had already subdued Walker. Freund did not bring any drugs that could have killed Walker. A strong case could have been made that Trent had masterminded the whole evening.

Significant evidence incriminated Trent. He owned nearly all the physical evidence gathered by the State: the apartment where the murder took place; the trunk in which Walker's body was found; the van in which the trunk was found; the business at which the van was found; the knife that killed Walker; the guns used to subdue Walker; the drugs used to inject Walker; the handcuffs used to bind Walker's hands; and the tape used to gag Walker's mouth. All three witnesses testified that Trent was in control of everything that transpired that evening.

There was also strong evidence that Trent possessed a motive and the intent to kill Walker. Trent was clearly a racist and was accustomed to having people obey his every command. Not only had Walker, a black man, openly defied Trent at Trent's own apartment in front of two women Trent was trying to impress, but Walker announced that he was going to have sex with a young white girl, with whom Trent also wanted to have sex, and that Trent would "just have to ignore it." Walker then came after Trent with a pistol in one hand and a baseball bat in the other. After disarming Walker and binding him with handcuffs and a gag, Trent repeatedly threatened to kill Walker. He uttered racial epithets and tortured Walker. He recounted his fantasy of killing and then having sex with a black man. He called Freund and Daniell, his "hit man," to come over to help him. He made both of them inject Walker, and he injected Walker several times himself. Our analysis of the facts of the case leaves no doubt in our minds that a defense of actual innocence based on implicating Trent would have been a "viable alternative" to the insanity defense.[91]

The law firm's decision to forgo this blame-shifting defense can reasonably be linked to two of its actual conflicts. To effectively present a defense based on shifting the blame to Trent, the law firm could have used information it obtained in its prior representation of Trent. The law firm's representation of Trent therefore presented an actual conflict of interest that adversely affected its representation of Freund in violation of Freund's right to the effective assistance of counsel. *Cuyler* requires that Freund's sentence be vacated on this ground alone.

must prove that the defendant specifically intended to injure or terrorize the victim. *See State v. Graham*, 468 So.2d 270, 271 (Fla.2d Dist.Ct.App. 1985).

90. We do not mean to imply that there was insufficient evidence to support Freund's conviction. This issue is not before us. We only submit that under the facts of this case, a reasonable defense would have been to deny the elements of the crime, including specific intent.

91. Not only was it a viable defense strategy, it was probably much stronger than the insanity defense, although such an observation is not germane to our analysis. Foley seemed to recognize just this as the trial came to a close. In his closing argument, he indicated to the jury, for the first time, that the evidence suggested that Trent, and not Freund, was the real murderer. Of course, after Foley and Duncan contended throughout the entire trial that Freund killed Walker, but was insane, this argument only further sealed Freund's fate.

The law firm clearly recognized that the insanity defense was not a strong defense even before the trial began. During plea negotiations, the law firm told Freund that the defense had no more than a 30% chance of success. Moreover, in a letter to the prosecutor, Foley claimed that Freund had "a unique, valid insanity defense and ... a *chance* at getting a *manslaughter* jury verdict" (emphasis added). This suggests that the law firm did not feel the defense would relieve Freund from criminal liability, but might lead to a lesser conviction. If the blame-shifting defense had been successfully presented, Freund would have been found not guilty.

We caution that our suggestion that a blame-shifting defense would have been more likely to succeed is but an observation intended to bolster our conclusion that the blame-shifting defense was a realistic alternative. After Freund is granted a writ of habeas corpus and is released from his conviction, the State will be free to retry him. Should the State exercise this option, our discussion of the relevant merits of Freund's defenses should not discourage Freund's new counsel from pursuing a defense of insanity or any other theory counsel deems warranted.

Furthermore, the decision to forgo the blame-shifting defense could also be attributed to Trent's pretrial allegations. The law firm reasonably could have concluded that the likelihood that Trent would renew his vigorous attacks against it would have been much less if it pursued an insanity defense than a blame-shifting defense.[92] As a result, the allegations created an actual conflict that adversely affected the law firm's representation of Freund, in violation of *Cuyler*.

■ There is less evidence that the law firm's prior representation of Mills adversely affected its decision to forgo a blame-shifting defense. We believe that conflict affected another tactical decision however. Mills was a key witness for the State. Just a few months before the murder, Mills met Trent when he offered to help her with her legal troubles. The two discussed assisting the police by setting up one of Trent's enemies. Trent further assisted her by referring her to the law firm, with whom she consulted in his apartment. This information directly related to her credibility when she testified to help the State prove that Freund, whom she barely knew, and not Trent stabbed Walker. Yet to question her about this information would run afoul of the law firm's duty of confidentiality. While Duncan did question her about her trafficking charges and Trent's assistance, he chose not to follow the line of questioning to its natural conclusion—that Trent provided her with an attorney. A conflict-free attorney could have used this information to discredit Mills and suggest bias. Thus, the law firm's prior representation of Mills adversely affected its defense of Freund. *See Porter*, 805 F.2d at 940 (finding adverse effect where attorney failed to discredit the testimony of "one of the prosecution's star witnesses" whom the attorney had previously represented). The actual conflict arising from this representation therefore worked a deprivation of Freund's right to the effective assistance of counsel, as interpreted by *Cuyler*.

### C.

■ The State argues that any conflicts of interest that affected the law firm's representation of Freund were waived by Freund. To support this argument, the State points to several facts. As to the conflict arising from the law firm's prior representation of Trent, Duncan testified at the evidentiary hearing in the 3.850 proceedings that he had advised Freund of the prior representation on many occasions. Freund was in the courtroom when Duncan discussed the potential conflict and the Bar opinion. Duncan also testified that he informed Freund's mother of the possible conflict. Finally, the State points out that "[a]t no time, either during trial or the direct appeal which followed, did [Freund] or his family express dissatisfaction with Duncan's representation [or] indicate that the firm's past representation of Trent interfered with Duncan's performance in the case or affected the outcome." Answer Brief at 35–36.

As to the law firm's past representation of Mills, the State points out that Freund was present in the courtroom when the attorneys and Judge Mounts discussed her refusal to submit to a deposition by the law firm. As to the allegations made by Trent against the law firm at the severance hearing, the State once again points out that Freund was present in the courtroom. After the allegations, Duncan and Freund met in a holding cell to discuss what had transpired. Duncan informed the court at the severance hearing, and later testified at the 3.850 evidentiary hearing, that he had confirmed that Freund had heard the allegations. Duncan inquired if Freund had "lost any confidence with" the law firm and whether Freund wanted new attorneys. Duncan reported that Freund responded that he felt that the law firm would represent him even more zealously in light of the allegations.

---

**92.** As mentioned *supra* note 80, the State argues that the law firm did adopt a blame-shifting defense because the theory of insanity was that Freund was a "robot" and that Trent made him stab Walker. While this defense does cast some blame on Trent, it is certainly less prejudicial to Trent's interests than an accusation that Trent was the murderer. Thus, the law firm's decision to pursue this defense indicates a choice of the least antagonistic of two defenses. This is sufficient.

We have held that "a defendant may waive the right to conflict-free counsel as long as the waiver is knowingly and intelligently made." *Duncan,* 881 F.2d at 1017. We will find a waiver of this right only if, at the time of the waiver, the petitioner "(1) was aware that a conflict of interest existed; (2) realized the consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) was aware of his right to obtain other counsel." *United States v. Petz,* 764 F.2d 1390, 1392–93 (11th Cir. 1985) (quoting *Gray v. Estelle,* 616 F.2d 801, 804 (5th Cir.1980)). Where the state court record does not reflect whether the petitioner was made aware of each of these elements, the State bears the burden of proving a valid waiver. *Petz,* 764 F.2d at 1394 n. 2 (citing *Zuck v. Alabama,* 588 F.2d 436, 440 (5th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979)).

Freund's state trial record gives no indication of whether Freund was aware of the *Petz* criteria, so the State bears the burden in this case. The facts pointed to by the State do not begin to satisfy its burden. At most, they establish that Freund was aware of possible conflicts of interest. None of the facts presented by the State shed any light on whether the second prong has been satisfied. The State does not contend that anyone ever discussed the consequences of the conflicts with Freund. If anything, the record suggests that none of the attorneys involved or Judge Mounts—or any other judge who reviewed the record but denied collateral relief—appreciated the consequences of the conflict. If a room full of attorneys and a trial judge are unable to comprehend the legal consequences of a conflict, how can one possibly expect a criminal defendant, with brain damage no less, to comprehend them?

Freund's failure to complain during trial or on direct appeal about the performance of the law firm has absolutely no bearing on the waiver issue. *See United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984) ("If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance. It is for this reason that we attach no weight to . . . respondent's expression of satisfaction with counsel's performance at the time of trial . . . ." (citation omitted)). We find that the State has not met its burden of proving that Freund "knowingly and intelligently" waived his fundamental right to be assisted by counsel free of multiple conflicts of interest.

## IV.

For the foregoing reasons, the district court erred in finding that Freund was not denied effective assistance of counsel due to the law firm's conflicts of interest. Because both the severity of these conflicts and their adverse effect on the law firm's representation of Freund are plain from the record, there is no need to remand this case for an evidentiary hearing. Accordingly, we VACATE the district court's denial of Freund's 28 U.S.C. § 2254 petition and REMAND the case to the district court with the instruction that it grant Freund a writ of habeas corpus.

SO ORDERED.